COLD METAL PROCESS COMPANY
and Union National Bank of Youngs-
town, Ohio, Trustee

v.

ALUMINUM COMPANY OF AMERICA.

Civ. A. No. 661.

United States District Court
E. D. Tennessee, N. D.
Aug. 18, 1961.

William H. Webb, Pittsburgh, Pa., Clarence B. Zewadski, Detroit, Mich., R. M. McConnell, Knoxville, Tenn., Morton Burden, Jr., Joseph R. Robinson, Jr., Pittsburgh, Pa., for plaintiffs.

W. D. Keith, New York City, R. R. Kramer, Knoxville, Tenn., Andrew H. Schmeltz, New Kensington, Pa., F. B. Ingersoll, Pittsburgh, Pa., Robert E. Isner, New York City, R. T. Teeter, New Kensington, Pa., for defendant.

ROBERT L. TAYLOR, Chief Judge.

Cold Metal Process Company (hereinafter called Cold Metal) brought this suit on March 20, 1945 against Aluminum Company of America (hereinafter called Alcoa) for infringement of U. S. Letters Patent Nos. 1,774,016 and 1,779,-195 issued respectively on January 14, 1930 and October 21, 1930 and referred to herein as '016 and '195. Each patent was issued upon the original application of Abram P. Steckel on June 30, 1923 and each has long since expired. On December 28, 1945, Cold Metal assigned the patents to Union National Bank of Youngstown, Ohio, which thereupon became a party-plaintiff herein.

Alcoa denied the validity, and denied infringement, of each patent. It also raised the question of jurisdiction of the Court with respect to transactions with the United States Government, under 28

U.S.C. § 1498, during the period February 24, 1941 through September 20, 1945. (This will be referred to as the Government defense.) The defenses that United Engineering & Foundry Company, a licensee of Cold Metal, (referred to herein as United) is an indispensable party and that plaintiffs lack equitable title were also made. For the sake of completeness, it should be noted that defendant claimed also that plaintiffs were barred by laches and that plaintiffs had misused the patents.

There were twenty-one mills of defendant which were alleged to infringe. One of these, R, was not included in the Order Pursuant to the Pre-Trial Conference. Of the remaining twenty, this Order limited plaintiffs' proofs with respect to infringement to eleven mills, listed below, the question of infringement of the remaining mills to be held in abeyance pending an accounting proceeding or until further order of the Court. The eleven mills upon which proof was adduced were:

| Identification in Pre-Trial Orders | Charged to Infringe Patent(s) No(s) | Nature of Operation | Usual Identification |
|---|---|---|---|
| C | '016 and '195 | Cold strip mill | Edgewater 42″ Mill |
| D | '016 and '195 | Cold strip mill | Edgewater 60″ Mill |
| E | '016 and '195 | Cold strip mill | West Plant 4 High Tandem |
| H | '016 and '195 | Cold strip mill | North Plant A Tandem |
| I | '016 and '195 | Cold strip mill | North Plant B Tandem |
| J | '016 and '195 | Cold strip mill | North Plant C Mill |

These six were all cold strip mills, were charged to infringe both patents, and all had Morgoil bearings. The remaining five, charged only to infringe '195, were:

| Identification in Pre-Trial Orders | Charged to Infringe Patent(s) No(s) | Nature of Operation | Usual Identification | Width in Inches |
|---|---|---|---|---|
| G | '195 | Hot mill | Continuous Hot Mill (North Plant) | 80″ |
| K | '195 | Foil mill (cold) | Arnold 42″ Foil Mill No. 159 | 42″ |
| L | '195 | Foil mill (cold) | Arnold 34″ Foil Mill No. 45 | 34″ |
| P | '195 | Foil mill (cold) | Edgewater 34″ Foil Mill No. 4 | 34″ |
| S | '195 | Foil mill (cold) | Foil Cluster Mill No. 3 (Alcoa) | 60″ |

Of these five, G was a five stand continuous hot mill. The remaining four were all single stand foil mills for cold rolling. These five had roller bearings. As we shall see, the six mills having Morgoil bearings were held not to infringe either patent and the ruling was not seriously contested by plaintiffs. So, the five mills before the Court at this time are G, K, L, P and S.

On January 23, 1953, the Court referred the cause to a Special Master who received the evidence, and on June 29, 1959 filed his Report, including Findings of Fact and Conclusions of Law. Briefly, the Master found that the claims in suit of each patent were, in the scope asserted in this cause, both invalid and uninfringed, but observed that if the Court should disagree with him as to the valid-

ity of '195 then he would have to conclude that the five mills other than the Morgoils, dealt with by the evidence, would infringe. He found this Court had no jurisdiction of a claim involving the Government defense, but that such suit would have to be brought in the Court of Claims. He found further that United is an indispensable party and that the Master and Court lacked jurisdiction because United was not joined as a party to the action; and that plaintiffs lacked equitable title to all accused cold and hot mills coming within United's license. He concluded that plaintiffs were not guilty of laches or of misuse of the patents.

These patents, and license agreements issued thereunder, have been heavily litigated both in this Circuit and in others. Twice, in litigation involving steel companies as defendants, the Court of Appeals for the Sixth Circuit has passed upon questions of validity and infringement of these patents. These two cases are Cold Metal Process Co. v. Republic Steel Corp., 233 F.2d 828 (certiorari denied 352 U.S. 891, 77 S.Ct. 128, 1 L.Ed.2d 86) and Cold Metal Process Company v. E. W. Bliss Company, 285 F.2d 231, decided December 21, 1960.

At the hearing on April 10–11, 1961 upon the Objections to the Master's Report, plaintiffs conceded that the Court of Appeals' decision of December 21, 1960 was determinative of the issues in this case with regard to Patent '016 and would be conclusive and binding upon this Court provided the petition for a writ of certiorari were denied by the Supreme Court. (Certiorari was denied May 1, 1961.) On the basis of these decisions, therefore, and particularly that in the Bliss case, that mills using Morgoil bearings, as distinguished from the "anti-friction bearings" claimed in the patents in suit, do not infringe said patents, patent No. '016 will not be considered by the Court either upon the question of validity or of infringement. It should be noted that issues as to patent '016 received only a token argument from each party.

Although for different reasons, there was concurrence by both parties at the hearings that it is unnecessary for the Court to consider the "Government defense". Defendant did not object to the Master's adverse decision on the issues of laches and of misuse of the patents and neither party argued those issues at the hearing.

 Remaining, therefore, in the case, for disposition by the Court, are the issues: (1) of validity and of infringement of '195; (2) whether United is an indispensable party, and (3) whether plaintiffs have equitable title to the patents in suit. As to the issue of validity, the burden of proof rests upon the defendant; as to proof of infringement, the burden lies with plaintiff.

Patent '195 is for a combination of old elements which plaintiffs say achieves a new function and a new result. It has been described, a score or more times, in District Court and Court of Appeals decisions both in this Circuit and in others, to some of which reference is here made. Cold Metal Process Co. v. Carnegie-Illinois Steel Corp., 108 F.2d 322, 334 (C.A.3); Cold Metal Process Co. v. Republic Steel Corp., 123 F.Supp. 525 (D.C.N.D. Ohio E.D.); E. W. Bliss Company v. Cold Metal Process Company, 174 F. Supp. 99 (D.C.N.D.Ohio E.D.); Cold Metal Process Co. v. Republic Steel Corp., 233 F.2d 828 (supra); and Cold Metal Process Company v. E. W. Bliss Company, 285 F.2d 231 (supra).

However, it will be necessary again to refer to this patent and to its claims in order to lay the groundwork for decision here. Briefly patent '195 is for an apparatus or machine for the high speed rolling of "metal strips of practically unlimited length". The patent described a rolling mill consisting of two working rolls between which the metal strip was passed, together with two backing rolls of larger diameter having anti-friction mounting or bearings, adapted to withstand the rolling pressures encountered and the high speeds employed. The drawings show that the four rollers of

the mill are mounted in a vertical plane one above the other with one large backing roll at the bottom, the two working rolls above it and the second backing roll at the top. In the jargon of the industry, a mill so designed was referred to as a "4-high", as distinguished from a rolling mill with only the two work rolls and no backing rolls which is known as a "2-high", or a mill with one backing roll known as a "3-high"; and, as further distinguished from a mill with two work rolls and two backing rolls for each work roll, arranged in V-shaped clusters above and below each work roll, this assembly being sometimes referred to as a "cluster mill".

Twelve claims of the '195 patent are in issue, namely, apparatus claims 3, 4, 6, 7, 8 and 11 to 17. The four accused cold rolling foil mills are charged to infringe only claims 3, 4, 6, 7, 13, 14, 15 and 17. Claims 8, 11, 12 and 16 relate to multiple stand mills. At the hearings before this Court, counsel for plaintiffs selected and read claim 4 as being typical. It reads as follows:

"4. A mill for rolling material of substantially uniform thickness, comprising working rolls provided with backing rolls of larger diameter, the backing rolls having necks of sufficient size to withstand the rolling pressure, anti-friction bearings for said backing roll necks, the diameter of the backing roll body relative to the diameter of the working roll being such as to permit of using anti-friction bearings of sufficient size to withstand the rolling pressure, said anti-friction bearings being of a character to withstand operation at speeds which are high relative to those ordinarily employed, a working roll having a neck extending between the anti-friction bearings of the backing rolls, and means for supplying rolling power through the working roll neck."

Plaintiffs conceded in their brief on their objections to the Master's report and in their oral argument before this Court, that each of the individual elements of the mill described in '195 was old. They asserted that it was the combination of old elements, bringing them together and positioning and proportioning them to function properly in the combination, which was new, and patentable.

█ It is generally held that, to be patentable and valid, a combination of old elements must produce a new function or new result. This principle of law is accepted by both parties. In Sheffield Car Co. v. D'Arcy, 6 Cir., 194 F. 686, 693, our Circuit Court had this to say:

"It is, furthermore, clear that a combination of old elements, to be patentable, must *produce a new force, effect, or result as the product of the combined forces,* as distinguished from a mere aggregation of the results of the old elements, each working out its separate effect and that a combination consisting merely of old parts and of old results, *without the addition of any new and distinct function,* is not patentable. * * *" (Emphasis added.)

In Great Atlantic & Pacific Tea Company v. Supermarket Equipment Corp., 340 U.S. 147, 151, 71 S.Ct. 127, 129, 95 L.Ed. 162, 1952, the Supreme Court said:

"The negative rule accrued from many litigations was condensed about as precisely as the subject permits in Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 664, 82 L.Ed. 1008: 'The mere aggregation of a number of old parts or elements which, in the aggregation, *perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention.'* * * * The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable. * * *

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to *add to the sum of useful knowledge*. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions * * * obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. * * *" (Emphasis added.)

See also France Mfg. Co. v. Jefferson Electric Co., 6 Cir., 106 F.2d 605, 609; Cugley v. Bundy Incubator Co., 93 F.2d 932, 934 (C.A.6); White Tool and Supply Co. v. Air Reduction Co., Inc., 48 F.2d 720–721 (C.A. 6), which were cited by plaintiff.

■ We have cited these cases, not as bearing on the validity of patent '195, but for the principle that in a patent which consists of a combination of old elements, one must look for a new function or force or result. The principle was applied by Judges Allen and Miller, respectively, in Cold Metal Process Co. v. Republic Steel Corp., supra, and in Cold Metal Process Company v. E. W. Bliss Company, supra, and each found new results and functions.

One other matter should be considered before reaching the merits. This Court is aware, as the Supreme Court has said in Sinclair & Carroll Co., Inc. v. Inter-Chemical Corporation, 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644, that it is the better practice to inquire fully into the validity of a patent even where the accused device has been held not to infringe. But it will be remembered that patent '195 expired shortly after suit in this case was brought and that a determination of validity in such situation is probably moot.

Judge Allen went into this question rather fully for the Court of Appeals of this Circuit in Dow Chemical Co. v. Skinner, 6 Cir., 197 F.2d 807, 811. The following quotation is from her opinion at pages 811–812.

"We next consider whether we are required to rule upon the validity of the Skinner patent although infringement has been found not to exist. It has been held both in the lower courts and in the Supreme Court that under such circumstances validity should not be adjudicated. Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263; Altvater v. Freeman, 319 U.S. 359, 363, 63 S.Ct. 1115, 87 L.Ed. 1450; Landis Machinery Co. v. Chaso Tool Co., 6 Cir., 141 F.2d 800, 805. In Altvater v. Freeman the rule that to hold a patent valid when not infringed is to decide a hypothetical case was held not to apply partly because of the existence of many claims in addition to the one involved in the issue of infringement and also because of the pending counterclaim which stated a real and existing controversy. In the instant case no counterclaim was filed and the issue of both infringement and validity was raised in the answer and amended answer. The claims involved in both issues (Nos. 1, 3, 4, 5, and 6) are the same.

"A later expression of the Supreme Court upon this question is found in Sinclair & Carroll Co., Inc. v. Interchemical Corp., 325 U.S. 327, 330, 65 S.Ct. 1143, 1145, 89 L. Ed. 1644 which declares:

" 'There has been a tendency among the lower federal courts in infringement suits to dispose of them where possible on the ground of non-infringement without going into the question of validity of the patent. Irvin v. Buick Motor Co., 8 Cir., 88 F.2d 947, 951; Aero Spark Plug Co. v. B. G. Corp., 2 Cir., 130 F.2d 290; Franklin v. Masonite

Corp., 2 Cir., 132 F.2d 800. It has come to be recognized, however, that of the two questions, validity has the greater public importance, Cover v. Schwartz, 2 Cir., 133 F.2d 541, and the District Court in this case followed what will usually be the better practice by inquiring fully into the validity of this patent.'

"Electrical Fittings Corp. v. Thomas & Betts Co., supra, and Altvater v. Freeman, supra, are not cited. In view of the wording of the paragraph quoted we think that a discretion resides in the lower courts to determine whether or not decision upon validity is required. The Supreme Court employed the significant word 'usually,' thus indicating that a ruling upon validity is not essential in all cases involving both infringement and validity. Here the patent has expired and the public interest involved in ruling upon validity discussed in Cover v. Schwartz, 2 Cir., 133 F.2d 541, which was cited with approval in Sinclair & Carroll Co., Inc. v. Interchemical Corp., supra, would not seem to be subserved. The question is moot, and we conclude that a ruling upon validity is not required."

See also Thabet Mfg. Co. v. Kool Vent Metal Awning Corp., 226 F.2d 207, 211 (C.A. 6), where Judge Miller had this to say:

"The Houseman Patent expired November 9, 1954. In view of that fact and our ruling against infringement, we find it unnecessary to rule on the question of the validity of the patent in issue. Dow Chemical Co. v. Skinner, 6 Cir., 197 F.2d 807, 811–812; certiorari denied 344 U.S. 856, 73 S.Ct. 94, 97 L.Ed. 664; Landis Machinery Co. v. Chaso Tool Co., 6 Cir., 141 F.2d 800, 805; Kemart Corp. v. Printing Arts Research Laboratories, 9 Cir., 201 F.2d 624, 634."

▇ The patent here admittedly issued for a combination of old elements. The validity of combinations of old elements rests upon a finding by the Court of a new result or function. On the other hand, should the Court find lack of infringement, in that the accused mills produced no new results or functions, such a finding obviously would rest upon the same considerations. Defendant's position is that where there is a combination patent in which all elements are old and an accused mill in which all elements are old, both validity and infringement turn upon the same evidence, namely, of new results or function. We believe this position is sound. Thabet Mfg. Co. v. Kool Vent Awning Co., supra, 226 F.2d at page 210; Electric Protection Co. v. American Bank Protection Co., 184 F. 916, 923 (C.A. 8); Electric Railroad Signal Co. v. Hall Railway Signal Co., 114 U.S. 87, 96, 5 S.Ct. 1069, 29 L.Ed. 96.

On the facts defendant states that it did not, by the use of the accused mills, accomplish a new result or function in the rolling of aluminum, over results which had already been achieved by various adaptations of the 2-high mills which were, of course, old. It states that the accused combinations achieved no new results of speed, greater reductions per pass, etc., even by the incorporation into its mills of flood cooling, and back tension which were not claimed in patent '195. Whether new results were attained in the 4-high or cluster mill with or without the added use of flood cooling and back tension is a question of fact which we shall get into later.

It is plaintiffs' position, on the other hand, that an alleged infringer may escape infringement in the use of a patented combination by omitting one element of the combination, but that it has never been the law that infringement may be avoided by the addition of other elements to the patented combination. Thus, the question is squarely presented: Assuming new results are obtained, do 4-high and cluster mills using non-friction bearings to which have been added the elements of flood cooling and back tension infringe plaintiffs' claims?

The Master held that patent '195 was invalid but that if the Court should disagree and hold the patent valid, then he would have to conclude that the five mills remaining in the case would infringe. The Master, of course, did not consider whether the question of validity was moot, but made the positive finding that there was no validity, and his findings on speed, amount of reduction per pass, etc., will have a substantial bearing on the question of infringement.

Under the holdings of the Court of Appeals in Dow Chemical v. Skinner, supra, and in Thabet Mfg. Co. v. Kool Vent Metal Awning Corp., supra, the Court concludes that it is unnecessary to consider the question of validity. It will, therefore, consider without reference to the Master's finding of invalidity whether, as a matter of law, if new results are obtained, an accused device may, under certain circumstances, avoid infringement of a combination patent even though it uses the patented combination.

Defendant relies heavily upon the case of United States v. Berdan Fire-Arms Co., 156 U.S. 552, 15 S.Ct. 420, 39 L.Ed. 530, which is strikingly similar on its facts to our case. Plaintiff contends that defendant's reliance is upon a dictum which cannot be authority here. The portion of the opinion stressed is found at page 565 of 15 S.Ct. 420, 424:

"* * * Beyond this it also appears that the patent was only for a combination, no single element of which was new; that it was intended for, and was successful when used with rim-fire cartridges, and was not successful when used with centre-fire cartridges; that the government uses only the latter cartridges; that, in order to adapt his patent to these cartridges the inventor added a new element for which neither singly nor in combination did he take out any patent. If, therefore, the government had used model No. 4, which was presented to the Hancock board, it would not have infringed any patent right. For where several elements, no one of which is novel, are united in a combination which is the subject of a patent, and these several elements are thereafter united with another element into a new combination, and this new combination performs a work which the patented combination could not, there is no infringement. * * *" (Emphasis added.)

Plaintiffs point to the earlier and latter portions of the same paragraph of the opinion to the effect, respectively, (1) that the United States never manufactured a gun after the model recommendation by the Hancock board and hence never trespassed upon any intangible right created by the patent and (2) that there was no evidence disclosing a contract and had there been an infringement it was only a tort which created no cause of action cognizable in the Court of Claims.

We have examined these two suggestions carefully. Both relate to question of fact—(a) whether the accused device had been manufactured and (b) whether there was a contract—matters which were disputed and the Supreme Court simply affirmed the findings of the Court of Claims. We are impressed that the Supreme Court was not satisfied with affirming this portion of the case on those two grounds alone. Although the fact that those two grounds were mentioned in the opinion may soften the force of the statement of law relied upon by defendant, we do not agree that its force is destroyed on the ground that it is a mere dictum.

Although the Berdan case goes somewhat further than other cases, the basic principle is not a novel one and is well recognized in the law. In Aluminum Company of America v. Thompson Products, 122 F.2d 796, 799 (C.C.A. 6). Judge Simons, speaking for the Court said:

"* * * While it is true that the mere addition of an ingredient to a patented combination, even if im-

provement is achieved, will not avoid infringement [Haynes Stellite Co. v. Chesterfield, 6 Cir., 22 F.2d 635], *the question is always whether a new and different combination results.* Certainly, the patentees may not exclude from their field of monopoly every alloy of aluminum which contains silicon. The question of infringement is one of fact * * *." (Emphasis added.)

Judge Simons, writing as a District Judge in Gordon Form Lathe Co. v. Walcott, 6 Cir., 20 F.2d 673, 674–675, had this to say:

" * * * I am convinced that Gordon and Redlin were pioneers in the art of turning nongeometric forms, and that the claims of their invention should be given great liberality of construction. It has been held, however, by the highest authority, that *mere similarity of function is not conclusive on the question of infringement, even in the case of a pioneer patent.* Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136. I am equally convinced that Melling constructed his machine upon an entirely different principle from that of the patent in suit, and that the means used for performing the same function, *except such means as are common to all lathes,* were different. He controlled the transverse movement of his tool with the replica cam of the Blanchard lathe; he reciprocated the cutting tool, and kept it normal to the work by swinging it upon a center remote from its point; his tool transcribed an orbital path, rather than a straight path to and from the work, as disclosed in an analysis of the patented device; and such elements contained in the Melling combination as are claimed to be equivalent to elements in the patent are not such when put to the test of interchangeability. Auto Hone Co. v. Hall Cylinder Hone Co. (D.C.) 3 F.2d 479; Pittsburg Meter Co. v. Pittsburg Supply Co. [3 Cir.] (C.C.A.) 109 F. 644; American, etc., Co. v. Philadelphia, etc., Co. (C.C.) 123 F. 891; Boyer v. Cleveland Pneumatic Tool Co. [6 Cir.] (C.C. A.) 185 F. 808.

"It is contended that the claims in issue of the Gordon and Redlin patent can be read upon the Melling device. This is not conclusive of infringement, where the principle of the two machines is different, and the means used are not the same. Westinghouse v. Boyden Power Brake Co., supra, and cases cited therein.

"The record is conclusive upon the fact that the Melling machine has come into wide commercial use, that it does the work for which the patented implement was designed much more accurately and satisfactorily than the Gordon and Redlin machine, and it would seem to me broadly that it was never the intent or purpose of the patent law to deprive the industry of the superior device, when, as here, the latter conforms to a different principle and uses different means for performing the same function, even though there are elements in each combination that bear some resemblance." (Emphasis added.)

In Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 568, 18 S.Ct. 722, the Supreme Court said:

"But, even if it be conceded that the Boyden device corresponds with the letter of the Westinghouse claims, that does not settle conclusively the question of infringement. We have repeatedly held that a charge of infringement is sometimes made out, though the letter of the claims be avoided. Machine Co. v. Murphy, 97 U.S. 120, 24 L.Ed. 935; Ives v. Hamilton, 92 U.S. [426] 431 [23 L.Ed. 494]; Morey v. Lockwood, 8 Wall. 230 [19 L.Ed. 339]; Elizabeth v. Pavement Company, 97 U.S. 126, 137 [24 L.Ed. 1000]; Sessions v. Romadka, 145 U.S. 29, 12

Sup.Ct. 799 [36 L.Ed. 609]; Hoyt v. Horne, 145 U.S. 302, 12 S.Ct. 922 [36 L.Ed. 713]. *The converse is equally true. The patentee may bring the defendant within the letter of his claims, but if the latter has so far changed the principle of the device that the claims of the patent, literally construed, have ceased to represent his actual invention, he is as little subject to be adjudged an infringer as one who has violated the letter of a statute has to be convicted, when he has done nothing in conflict with its spirit and intent. 'An infringement,'* says Mr. Justice Grier in Burr v. Duryee, 1 Wall. 531, 572, [17 L. Ed. 650], *'involves substantial identity,* whether that identity be described by the terms, "same principle," same "Modus operandi," or any other. * * * The argument used to show infringement assumes that every combination of devices in a machine which is used to produce the same effect is necessarily an equivalent for any other combination used for the same purpose. This is a flagrant abuse of the term "equivalent." ' " (Emphasis added.)

In Electric Railroad Signal Company v. Hall Railway Signal Co., 114 U.S. 87, at page 96, 5 S.Ct. 1069, at page 1075, 29 L.Ed. 96 the Court said:

"In considering them it is important to bear in mind that the patent is for a combination merely, in which all the elements were known and open to public use. No one of them is claimed to be the invention of the patentee. He does not claim them himself as separate inventions. It is simply a new combination of old and well-known devices, for the accomplishment of a new and useful result, that is claimed to be the invention secured by the patent. And the well-settled principles of law, heretofore applied to the construction of patents for combinations merely, must apply and govern in the present case.

"The object of the patented combination was the accomplishment of a particular result, that is, to work electric signals on what was known as the 'block' system, by means of circuits, operated by a single battery instead of many. But this result or idea is not monopolized by the patent. The thing patented is the particular means devised by the inventor by which that result is attained, leaving it open to any other inventor to accomplish the same result by other means. *To constitute identity of invention, and therefore infringement, not only must the result attained be the same, but in case the means used for its attainment is a combination of known elements, the elements combined in both cases must be the same and combined in the same way, so that each element shall perform the same function, provided, however, that the differences alleged are not merely colorable, according to the rule forbidding the use of known equivalents.*" (Emphasis added.)

See also Martin v. Ford Alexander Corp., D.C., 160 F.Supp. 670, 676; Blastcrete Equip. Co. v. Ridley, D.C., 174 F.Supp. 277, 279–280.

■ Apart from the challenged authority of the Berdan case, we cannot say on the authority of the subsequent cases we have cited, that the mere inclusion of a patented combination of old elements as a part of a new combination of old elements is *per se* an infringement. Are the results obtained in such a manner that they are the product of the new and expanded combination? Aluminum Co. of America v. Thompson Products, supra.

### Infringement

On the question, therefore, of infringement, we have two related questions of fact: (1) Did the accused mills achieve new results of speed, great reductions per pass, etc., in the field of aluminum? (2) Even if the accused mills achieve new results or function, are the improvements to the old combination of flood cooling

and back tension such that a new and different combination and principle of operation result?

In the specification of Patent No. '195 certain superior results are claimed for the combination. In paragraph one are asserted: (1) the operation of the mill at high speeds and (2) the rolling of metal strips of practically unlimited length. In paragraph two reference is made to patent's (3) usefulness in rolling metal of great thinness relative to its width. In paragraph four the applicant amplifies item (1) by stating that he contemplates speeds several times 150 to 200 feet per minute, and removal of speed limitations on both hot and cold mills. In paragraph six and seven we read that the applicant's handling of the problem of heat controlled the contour of the roll and (4) substantially prevented buckling and wrinkling of the material. In paragraph eight and nine he asserted the advantage of (5) reduction in the amount of power used. In paragraphs nine and ten he said (6) the product was free of heavy center or crown. In paragraph twelve he noted with his device (7) a perceptible lack of wear in the bearings resulting in better adjustment.

In his Report, the Special Master observed that in the Republic Steel case, (233 F.2d 837), the Court of Appeals held that the District Court was justified in finding the following new results:

"(1) Speeds far in excess of the prior art;

"(2) Operation, without overheating of backing rolls and buckling and riffling of the strip, at speeds which under the prior art had brought on overheating and buckling and riffling;

"(3) Elimination of intermediate annealing for low and high carbon steels and some alloys, reduction in the cases of some other alloys, consequent saving of much time and money;

"(4) Increase of thinness of the product by 30 or 40 percent;

"(5) Increase of width of product many times;

"(6) Increase of length of product from a limit of 8 to 13 feet to hundreds of feet."

To these six the Master added three other results found by Judge Buffington in the Carnegie-Illinois Steel Corporation case, 108 F.2d 322, namely, a remarkable change in an art theretofore quiescent and stagnant, (which the Master dismissed from consideration as being a mere summarization of the total effect of the others), lessened costs, and improvement in the working conditions of labor.

It should be noted that the result of heavy reduction per pass upon which plaintiffs greatly relied was not claimed in the patent, nor mentioned in these prior decisions.

As the Court has indicated, the burden is upon the plaintiffs to prove, by a preponderance of the evidence, infringement of the accused mills. Where the patent consists, as here, of a combination of old elements, it is not sufficient that plaintiffs show that defendant used the combination claimed in the patent, his task is more diffused—of showing that the accused mills obtained, over other mills in the same field, new and useful results or a new and useful function.

The parties amassed a record in excess of 14,000 pages, exclusive of exhibits, a considerable portion of which dealt with questions not now before the Court. The Court is cognizant that, in its Order of Reference to the Special Master, it stated that the Master's Report would be advisory only and not binding upon it. Nevertheless, because of the magnitude of the record and because of the meticulous accuracy of the Master's work, the Court places substantial reliance upon the Master's findings and especially where they rest upon live testimony taken before him.

With this background, the Court proceeds to a consideration of the question of infringement of patent '195. For perspective in understanding various practices and terminology in the aluminum

rolling art, the Court here includes (omitting the references to the Record) the footnote beginning on page 61 of the Master's Report.

"The following is taken from Defendant's Main Brief, pp. 16–18, being supported by the record and not in controversy:

"The term 'sheet' has been used in aluminum rolling to define sheet-like products of a gauge of thickness ranging from .249 down to .006. Sheet-like products of lesser thickness are called 'foil'.

"The rolling of aluminum and its alloys is broadly divided between hot rolling and cold rolling. The distinction between 'hot' and 'cold' rolling is that in hot rolling the metal is intentionally heated to some elevated temperature before entering it in the rolling mill, while in cold rolling the metal is not intentionally heated. The terms 'hot rolling' and 'cold rolling' do not imply that the aluminum material being rolled is delivered from the mill at any particular temperature. The temperature of delivery varies in each case.

"Hot rolling is used to 'break down' the starting material, which is called ingot, to a gauge or thickness where cold rolling is started. It is also used to produce some plate and some sheet. Cold rolling of aluminum and its alloys has always started at a thickness of somewhere between ½ inch or .500 and about .100 inch. This varied somewhat with the particular plant or location where defendant was conducting rolling operations and the time period involved. Thus in the period 1919 to 1922 defendant usually started cold rolling at thicknesses of .375 to .125 and sometimes as high as .500. But, as years went on, less cold rolling was started at the heavier gauges. In the period 1938 to 1947 at Edgewater Plant defendant usually started cold rolling at thicknesses of .102 to .190. In the period 1941 to 1947 at the Alcoa plants defendant usually started cold rolling at its West Plant at thicknesses of .102 to .162 and at its North Plant at thicknesses of .105 to .200. Hot rolling started on what are known as 'hot mills' and was either ended on such mills or on other mills known as 'continuous mills'.

"The hot rolled material was then sent to the cold mills, where it was cold rolled by one or two methods—the flat sheet method or the coiled sheet (or strip) method—to produce the commodities foil, sheet and, occasionally plate.

"The great majority of the commodity, plate, was produced entirely by hot rolling, but, sometimes, plate rolling was finished on the cold mills.

"The commodity, foil, was produced exclusively by the cold rolling processes known as 'coiled sheet' (or strip) process of cold rolling.

"The commodity, sheet, was produced by cold rolling, which started at the thicknesses above mentioned. If the commodity to be produced was 'coiled sheet', sometimes known as 'strip', it was produced by the 'coiled sheet process'. If the commodity to be produced was 'flat sheet', it was produced either by the 'coiled sheet' (or strip) method or by the 'flat sheet' method.

"Cold mills used in aluminum rolling to cold roll by the coiled sheet (or strip) method are known as 'strip mills' or, occasionally 'coiled sheet mills.' Cold mills used in aluminum rolling to cold roll by the flat sheet method are known as 'flat sheet mills.'

"The commodity 'flat sheet' is known as such in aluminum rolling, because it is sold in an uncoiled or flat condition in short lengths. It can be, and is, produced either on strip mills, in which case it is rolled in coils by the coiled sheet method and thereafter cut into short lengths and flattened, or it is produced on the flat sheet mills, in which case

it is rolled in the flat, as distinguished from the coil form, and in the lengths desired.

"The commodity 'coiled sheet', sometimes called 'strip', is known as such in aluminum rolling because it is rolled in the form of coils of relatively long length and sold in that form.

"The flat sheet method and the coiled sheet, or strip, method have both been used by defendant in the cold rolling of sheet in the period 1915 to date. Both methods were being used by defendant in 1915 and both methods are used today. Well over half of the total sheet produced by defendant prior to 1922 was produced by the coiled sheet method and such has been the case from 1915 up to today.

"In the flat sheet method the sheet is simply passed back and forth between the rolls maintaining the sheet in its flat condition. The metal is cold rolled in single sheets down to .032 gauge, but for the production of gauges lighter than .032 single sheets are packed, i. e. piled on each other and cold rolled together. The reductions per pass are small, varying from less than 1 per cent up to 5 or 10 per cent. No back tension is used in the flat sheet rolling method.

"In the coiled sheet (or strip) method of cold rolling the metal is rolled in longer lengths and is in coil form before it enters the mill and is coiled after it leaves the mill. (The one exception to this is in the case of the single stand 4-high mill at defendant's Alcoa North Plant. The sheet is occasionally not coiled after cold rolling but comes out of the mill under a shear which chops it up into short lengths.) The reductions per pass usually vary from 20 to 50 per cent, and back tension is always used on the aluminum material entering the mill. Front, or forward, tension may or may not be used during the coiling up of the aluminum material leaving the mill."

In the Republic case, Judge Allen found that the elimination of annealing was one advantage justifying a holding of validity of the patent. This advantage may be summarily disposed of, as being non-existent in this case. Plaintiffs do not now claim that the alleged use of its combination avoided the necessity of annealing. Counsel for plaintiffs categorically so stated in the hearing before this Court: "Elimination of intermediate annealing, they don't get * * * And that is due to the fact that metalurgically (sic) there are conditions that make it desirable to do the intermediate anneal." Furthermore, although there was a minor clash in the argument whether working conditions were improved, plaintiffs' counsel said they did not bother to prove the point. And we are satisfied that there is no cogent proof in the record that the invention substantially ameliorated working conditions.

■ The Master tended to discount Judge Buffington's emphasis upon a remarkable change in a stagnant art, as merely a statement of conclusion as to more specific benefits. And we agree. Remaining are six hard core contentions of plaintiffs that the patent '195 increased the width of strip, the speed of rolling length of strip, thinness of strip, reduction per pass, and eliminated buckling and wrinkling. Reduction of use of power, or reduction of costs, would seem to stem from the achievement, if any, of some or all of the above six claimed benefits.

To understand plaintiffs' contentions and defendant's replies with respect to them, it is desirable to look further into the rolling operation. The ingot to be reduced or the sheet to be further reduced (sometimes to the thinness of foil) was fed between the work rolls. In different mills these work rolls had different diameters but were relatively small by comparison with the diameters of the backing rolls. The power necessary to move the material through the rolls was ordinarily applied to the work rolls. Sometimes this application of power was supplemented by forward ten-

sion on the strip. That is, it was by various means pulled through the work rolls, much as one would pull a garment through the wringer of an old-fashioned washing machine. This forward tension or pull was involved in No. '016—but was not claimed in No. '195. Power was not applied to the backing rolls. They were normally relatively great in size with roll necks relatively large by comparison to the work rolls, and their function was to support the work rolls and to prevent their deflection. However, in most mills, the backing rolls had an additional function, namely, as the agency for the application of pressure to the strip. This was done by screw devices operating upon the backing roll bearing assembly, and the pressure upon the backing rolls was imparted to the work rolls. Thus, although all members of a 4-high assembly were under strain, one focus of pressure and of generation of heat was at the bearings and necks of the backing rolls, as the resistance from the strip which was being rolled met there the force from the pressure applying screw devices.

The necks and bearings of the backing rolls were thus subjected to stress. It was plaintiffs' theory that heat developed in the bearings and roller necks, which heat spread to the backing rolls and thence into the work rolls. It is common knowledge that many materials expand with heat. Plaintiffs claim this was true of the backing roll necks and backing rolls proper, and that the hottest part of the roll would be near the necks. It was further the theory that as these portions heated up and expanded, they would impart some of their heat to and impose greater pressure upon the working rolls at those points. The effect would be that the strip passing through the mill would receive greater pressure at its edges, and would therefore be thinner at those points. The strip would thus be measurably thicker in the center where the working roll received less heat and pressure from the backing rolls.

Flatness was the desideratum of metal strip, but if it were thicker in the middle and was rolled more thinly at its edges, its edges tended to become wavy and wrinkled. Sometimes rolls were made a little larger in the middle to compensate for the expansion of their ends; in which case, it sometimes occurred that the strip was thinner in the middle than at the edges producing another type of distortion.

Plaintiffs' patent was directed toward some of these difficulties by providing a more easily running, or non-friction, bearing which would not heat up as much and would tend to eliminate or reduce this source of heat and of distortion in the strip.

Another, perhaps the major, source of heat was the ingot or strip itself which may have been heated to start with or which became hot from the rolling pressures. The more pressure that was applied, the greater the heat. If finish were not required, it was an advantage of the operation to apply heavy pressures—because the more the strip was reduced at each pass, the fewer the number of passes, with consequent economies.

This, in broad strokes, is the nature of the problem.

By the provision of a non-friction, or roller bearing, plaintiffs claim to have eliminated so much of the wild heat engendered in the rolling operation that the "hard core" results we have listed were attained. Defendant stresses that both 4-high mills and roller bearings were old, and that the claims are directed to elements taken from the public domain, that is, old elements. In such cases, as indicated, infringement is to be tested by new function and result and not by mere comparison of the bare elements of the rolling mill structure with those of the accused mills.

It is plaintiffs' contention that their combination of work rolls of substantially uniform diameter, backing rolls of much larger diameter and anti-friction mountings on the backing rolls brought about new and useful results in the rolling of sheet and strip-like material. It is defendant's contention that all results

claimed for the combination had already been achieved by it with various forms of its 2-high mills.

## Wider Widths

Plaintiffs claimed that defendant was able to roll wider widths by the coiled sheet method for the production of aluminum sheets, and that prior to 1923 it could not obtain the wider widths by the coil-sheet method, but had to resort to the cumbersome flat-sheet rolling method. Defendant's answer to this is that the wider widths for coiled sheet were a result of the backing rolls. In order to understand this claim of the plaintiffs, it is well to bear in mind, as the Master found, that defendant rolled wider metal in 1923 on 2-high mills than it has on the accused mills, that it had rolled up to 72" wide as early as 1923. This was by the flat sheet rolling process. So defendant did not and never attained wider sheet by use of the accused mills. The rolling of aluminum had many phases, and width alone was not a result of the accused mills. The Master commented that defendant found 4-highs desirable for certain operations because of their superior rigidity, which resulted in greater reductions *per pass* (not thinner material), decreased the amount of crown needed in the work rolls, and made possible somewhat greater widths. All this as Steckel pointed out in a speech before a technical group in 1932 was the result of 3-high and 4-high design. He said:

> "Fifty years or more ago the inherent weakness of two-high mills as to bending of rolls when rolling wide plates was recognized and cured by a Mr. Lauth who stiffened the mill against roll bending by developing three-high design. *The still better four-high design is perhaps as old* as the three-high, but we want to emphasize that both of these old developments aimed only at stiffening the mill against roll deflection. * * *"

If the operator wanted wide flat sheets he could get it with a two-high by limiting the amount of the reduction. If he wanted heavier reduction he stiffened or backed his rolls and could get a wider sheet with heavier reduction in the process. The real controversy as the Master observed concerned widths cold rolled by the strip or coiled sheet process. And the difference between the flat sheet and coil-sheet method is the reduction per pass—something Steckel didn't mention in his patent.

Plaintiffs argued that the width limitations on the coil-sheet method prior to 1923 was approximately 20 inches; and that with the coiled sheet method which they say offered greater economies, defendant rolled in ranges from 36 inches up to 64 inches, which was better than three times the widths which could be rolled by the coiled sheet method under the old process. But as we shall see, width and speed had no significance except in connection with heavy reduction per pass, something which was not mentioned in the specifications or claims of No. '195, nor in the authorities upon which plaintiffs rely.

How important, how basic a result is this quadruple thing of length, width, reduction per pass and speed? Defendant says the accused mills don't get the greatest width, nor the greatest length, nor the greatest speed. If these are tied in with reduction per pass, something unclaimed and unmentioned in authorities relied on, then there is a different result but one not dependent upon the combination but upon the stiffening which goes with a back-up mill—or as defendant says with the known results of backed up mills prior to 1922.

In a case of such complex facts as this, it will bear reiteration that the burden of proving infringement rests with the plaintiffs. It is they who must prove by a preponderance of the evidence that the advantageous results claimed for this patent actually flow from the use of the combination rather than from other of the elements of the accused mills.

Pursuing the subject of width a little further, the Master found that the increase in the width of metal strip with 2-high mills was a progressive thing.

Between 1917 and 1930, defendant moved from a width of 8 or 9 inches and gauges as low as .0005 on a 9 x 16 inch mill to 16 to 18 inches wide and a gauge of .00025 on a 9 x 22 inch mill. By 1932, using a 10 x 28 inch mill, they rolled 26½ to 27 inches wide at a gauge of .00035. In 1941, the first 4-high accused foil mill was installed at the Arnold plant with rolls 42″ wide. The widest metal rolled on these mills was 26″. On the 34″ 4-high, metal was rolled at approximately the same width as on the 10 x 29½ two-highs.

As the Master indicated, there is no credible proof that these somewhat increased widths rolled on the 4-highs were not due to the longer work roll with the 4-high backing rather than to the practice of the combination.

During the same period, defendant was utilizing 2-high mills with larger work rolls, up to 14″ in diameter. In 1929, it had at the Arnold foil plant six 14x32 inch 2-high mills which rolled material 24 to 26 inches wide and reduced it from .012 to .002 in three passes, an average of approximately 50% reduction per pass. In 1931, 14x32 inch 2-high mills were placed in tandem and rolled metal from 26½ to 29 inches wide, reducing the metal from .102 to .006 with reductions of approximately 50% per pass.

The Master's report states that an accused 4-high mill at Edgewater had 14½x42 inch work rolls which usually rolled up to 35 inches, but had rolled up to 39 inches. Reductions were up to 35% on heat treatable alloys and 50% on common alloys. This was not a foil mill, but was used 60% as a break-down mill and 40% as a finishing mill. As to this mill, the Master concluded that this mill did not displace the 14 inch 2-high mills, although they were displaced by 34 inch long 4-high mills for reasons other than width of product. This conclusion is sound.

Without recounting here all the evidence considered by the Master, the conclusion is justified that with longer 2-high rollers and the addition of bridles, widths up to 20 and 22 inches could be rolled with gauges down to .016. Thinner gauges could be rolled in narrower widths.

Where gauge was not the desideratum with 28″ 2-high mills in 1921 to 1927, defendant made reductions of 20% per pass. Width was 34 inches maximum. In 1941 to 1947, there was testimony the same mills used primarily as break-down mills rolled to a width of 40 inches maximum.

A 2-high 30x60 inch mill installed in 1947 equipped with bridles and flood lubrication and Morgoil bearings rolled widths up to 52½ inches wide and at speeds of 1150 to 1200 feet per minute. In passing, we would observe that Heilman testified that the average gauge on this mill was less than on a 4-high although the length of the coil rolled was greater. This instance points up the fact that width, length and gauge are interrelated and depend upon the size of the ingot with which the operation starts. A rubber band has so much mass. If it is stretched, it becomes thinner, and its width may be narrower. The largest ingot ever rolled by defendant was 5600 pounds. Commercial production ran between 3500 and 3700 pounds. Standard size ingots in 1932–38 ran 800, 1500 and 3000 pounds. Standard size for strong alloys for hot rolling in 1943 to 1947 ran 3900 to 4200 pounds. Much depended upon the order. In a very important sense, these factors of width, length and gauge are determined by the product sought. We have permitted ourselves this digression because of further problems involving claimed advantages which must be considered later.

But one thing seems clear that in the 2-highs, if width is what is desired there is a correlation between width and the diameter of the roll. This gives support to defendant's contention that with respect to width it was the rigidity which went with 4-highs which was important and not the combination. And this rigidity or stiffening was, as Steckel admitted, long known in the art.

Turning to one of the accused mills not now before us, the Edgewater 60″ 4-high mill produced a finish width of 48″ and break-down widths of 52 to 53 inches. West plant tandems with work rolls 21 inches in diameter rolled in 1941–47 widths up to 51½ inches. In the North plant, the accused mills rolled up to 57½ and 64 inches.

The Master concluded, " * * * Bearing in mind constantly that the width of materials rolled is limited by the length of the rolls, that long before Steckel it was a part of the public information that 4-high mills can accommodate rolls much longer than 2-high mills, and that in this case the accused mills with roll lengths of 72″ were by that circumstance enabled to roll wider material than 2-high mills with only 60″ roll lengths, I find that this record falls far short of showing that * * * the production of aluminum sheets 'many times wider than was previously possible' was accomplished by any new thought of Steckel's."

The Court concurs in the Master's finding. Stated in another way, plaintiffs have not carried the burden resting upon them to show that new results in the matter of width resulted from their combination.

## Speed of Operation

Coming now to the speed of operation, the Master commented in a footnote, which found full support in the record:

"In foil rolling it is true that in both 2-high and 4-high mill operation the speed of the break-down pass is not as high as that of the intermediate pass. The split pass, which follows next after the intermediate pass, is run at about the same speed as the intermediate pass, if the finish is not to be high, but if the final finish is going to be high, the split pass must be run slower than the intermediate. *Thus the speed is determined more by the results desired as to finish than by the type of mill used.* In 1938, and afterwards, the higher finish would be rolled at a finish pass speed as low as 250 feet but if a high finish was not a primary requisite, the speed was raised to between 300 to 400 f. p. m. 2-high and 4-high operation is alike also in that increasing the speed while rolling produces greater reduction of the strip." (Emphasis added.)

Thus, it is seen that speed is a relative thing and, like length of strip, may not be considered in a vacuum.

Speed of operation as well as width of strip experienced a progressive development over the years. Around 1920, a 2-high 9x16 inch mill at the Arnold foil plant attained a speed of approximately 45 feet per minute with a water cooled babbitt-lined bearing. A re-wiring of the motor increased this to 65 feet. In 1924, a variable speed motor using alternating current increased this to 140–180 feet per minute and in 1928 a direct current motor increased it to 300 f. p. m. About 1938, flood lubrication (or what has been sometimes called "flood cooling" in the record) improved speed of these mills to 450 f. p. m. with gauges as low as .00035. As one of the defendant's witnesses commented, improvement in speed was a sort of progressive thing.

Since flood cooling was not claimed by plaintiffs (nor back tension) and since their use was considered by defendant such a departure as to result in a new and different combination we deem it advisable to break into our discussion at this point to obtain a clearer picture of flood cooling.

This usage like others we have been considering evolved over the years. Prior to 1922, defendant had in operation at its Alcoa West Plant a 28x60 inch 2-high mill which had grease lubricated, water-cooled bronze bearings. Originally, the only lubrication of the roll itself (as distinguished from its bearings) was by means of a roller-operated swab. Later drip-type lubrication was provided and operated with about 40 to 50 drops per minute. From these early beginnings it is easy to see why the terms flood cooling and flood lubrication are often used interchangeably.

On other mills, lubrication increased to 60 to 75 drops per minute.

After 1946, there was installed at the Alcoa North Plant a 30x60 inch 2-high mill with Morgoil bearings and equipped for a flood cooling capacity of 350 gallons per minute. The mills equipped with the drip-type lubrication operated at speeds of around 200 feet per minute while the mill with the 350 gallon per minute lubrication ran at speeds of 1150 to 1200 feet per minute.

As the Master noted, the need for direct lubrication of the area of contact between roll and metal was perceived early. But flood lubrication went far beyond that. Equally or more important than the lubrication of the pass was the cooling effect upon the roll body of the lubricant spurting from great numbers of carefully placed jets and separately controlled so that the heat might be "driven" here and there in the roll body correcting distortions arising from the high temperatures. The Master contrasted this practice with the utilization of roller or Morgoil or other bearings on the roll necks which were designed to reduce the localized heating effect in the roll necks due to their rotation under load. He commented further: "The use of any such bearings does not eliminate the need for flood cooling. The defendant's results were obtained by both bearings and flood cooling. * * * Bearings have only a limited ability to control heat. Bearings on backing roll necks, although satisfactorily controlling the heat generated in the roll necks, cannot also serve to cool the bearing necks to the point where roll body heat generated by the friction of reduction can be dissipated without distortion of the rolls. Similarily, flood cooling has only a limited ability to control heat. In practice, higher speeds cannot be reached by flood cooling without the help of low friction roll neck bearings, and *the reverse also is true.*" (Emphasis added.)

Although not focused on the question of infringement, the Master's further comments on the accomplishments of the Steckel combination have a pertinency here:

"I recognize that the overcoming, in one of these two seats of obstacles to high speeds, of the adverse factor there present may be invention even though the other problem is not solved by the same conception. As an original proposition the fact that the high speed claim for the patent cannot be fulfilled by Steckel's combination alone might not of itself prove the absence of invention. But in the Republic Steel decision and in prior decisions the patents have been upheld because of accomplishments, and the inability of Steckel's combination to achieve the speed and other effects claimed for it without the help of flood cooling indicates that the tests of validity applied in these prior decisions are not satisfied upon the present record."

Returning to the question of speed, the history of speed improvement on the 14x20 inch 2-high mills at the Arnold foil plant parallels that with respect to the 9x16 inch 2-highs at the same plant. In 1918, they operated at 65 f. p. m. By various improvements in the motors, speeds were stepped up by 1942 to operating speeds of 250 to 345 f. p. m., and this was true when the rolls were lengthened to 30 inches.

Two 14x32 inch 2-high Tusa mills in Unit No. 1 operated in 1941–1947 at speeds of 200 to 300 f. p. m. Two similar mills in the No. 2 plant reached speeds of 290 f. p. m.

Now, we note a startling bit of evidence. Three 14x32 inch 2-high Tusa mills equipped with Morgoil bearings and with flood lubrication operated at speeds up to 600 f. p. m. by 1938. One of these mills used as a break-down mill achieved speeds of 200 to 300 f. p. m.

We shan't clutter the record with the history of all 2-high mills employed by Alcoa. Our interest is to test the accuracy of plaintiffs' claim that the various hard core benefits we have enumerated resulted from the use of 4-high mills

equipped with non-friction or roller bearings. The evidence mounts that most, if not all, the advantages claimed for the accused 4-highs were obtained by defendant with its more advanced 2-highs. This is especially striking as we consider defendant's longer 2-highs.

In 1950, defendant installed a 24x48 inch 2-high at the Alcoa North Plant. It utilized flood lubrication and bridle (and tension unwind and tension reel not now before the Court). This mill operated at a top speed of 1200 f. p. m. A similar mill at Edgewater but using Morgoil bearings along with flood lubrication operated at speeds of 900 to 1200 f. p. m.

In 1950, a 30x60 inch 2-high mill equipped with Morgoil bearings, bridle and tension unwind and reel and flood lubrication had a top speed of 1200 f. p. m. Plaintiffs contend that it was not proper to introduce evidence of these mills since they were installed after the period of the patent and that non-infringing mills were being constantly improved. In answer to this, we note the rather primitive drawings and concept of Steckel in his patent No. '195. We note particularly Fig. 3 and the paragraph on page 2 of the Specifications in which he extolled the rolling of steel 7 inches and 16 inches wide. We must reject this criticism of the evidence of the 1950 2-high mills.

Coming now to some of the accused mills. The Continuous Hot Mill, (No. "G" Pre-trial Order) which was a 5-stand 4-high continuous mill, had a delivering speed of 850 f. p. m. Mill "K" had a speed range of 300 to 900 f. p. m. Mill "L" operated at 284 to 874 f. p. m. Mill "P" had a speed range of 750 to 1500 f. p. m. And Mill "S" a speed range of 481 to 1441 f. p. m. None of these speeds were startlingly in excess of those achieved on the 2-highs discussed above. And only two exceeded even in a limited decree speeds attained on the 2-highs. Defendant did not by use of the accused mills achieve any substantial increase in speed over that of its 2-highs.

## Length of Strip

Plaintiffs urge the consideration, dealt with by the Court of Appeals in the steel cases, that the Steckel mill produced longer lengths of material. In the argument before this Court, plaintiffs asserted that the patent in suit had been used to get rid of terrific limitations on the flat sheet rolling process by going to the coiled sheet process which utilized the accused mills for the rolling of materials in widths and at speeds and with reductions per pass which could not have been accomplished on the old mills. We have already examined the question of widths and speeds and have concluded that the record is devoid of evidence that there was notable improvement in widths or increased speeds.

Plaintiffs then say that although the record suggests that defendant rolled wide widths long before Steckel, they did it by the flat sheet method and only at very slow speeds, with small reductions per pass. They emphasized that the important thing was the correlation between a lot of these factors and stated that nowhere in the art was there anything before Steckel which enabled an operator to roll such widths, with the heavy reductions per pass and at high speeds. The contention is made strongly that the Steckel invention permitted rolling heavier gauges in wider widths by the coiled sheet method as against the more cumbersome flat sheet method.

The Master found that plaintiffs did not seriously press the claim that the accused mills yielded longer products, observing that coil size had increased through the years on both 4-high and 2-high mills because of the increase in the size of ingots which were used. We have already adverted to this very briefly.

The Master summarized the evidence that the matter of coil weight and length was controlled by items extraneous to the mill such as cranes, hoists and other equipment for handling metal, which was as available to 2-high as to 4-high mills. He reiterated what we have previously

observed that the chief advantage of a 4-high over a 2-high was its capacity because of superior rigidity to handle wider coils. But he concluded, and on the evidence offered by the defendants his conclusion is unassailable, that in the field of aluminum the accused mills did not accomplish any increase in the length of product. In fact, defendant stated in its argument and without contradiction, that defendant long before Steckel was rolling lengths of metal of thousands of feet, one strip being 10,000 feet long and that the defendant had used the same coil sheet process on its 2-high mills as far back as 1914. We conclude that length of strip was not in itself an advantage of plaintiff's patent.

### Thinness of Product

In dealing with this subject, the Master observed that exit gauge as well as entering gauge is closely related to speed, variations in roll contour, width and undesirable distortions in metal. He pointed out what we have previously hinted, in connection with width, that to discuss one factor without at the same time specifying other factors such as speed, reduction, width, etc., is apt to be misleading. He also observed that plaintiffs had complained of defendant's tendency to do this; and that for defendant to say that its 2-high rolled down to the same gauges as the 4-highs without bringing out the speeds, width, amount of reduction, etc., was piecemeal and a half truth. He then commented that defendant had leveled somewhat the same criticism at No. '195 itself, in which the only examples used indicated Steckel was thinking in terms of modest widths such as 7 to 16 inches. The Master commented that in examining the patent, more frequently than not, one does not experience a comfortable feeling of knowing with fair accuracy of what the patent was talking about with respect to speed, width, gauge, etc.

This is a difficulty inherent in a combination of old elements where validity and infringement have been made to turn not upon a particular result but upon disjoined "advantages" severally noted in the patent and by the reviewing courts. On the advantage of thinness of product there is not the slightest doubt on the record, and no end would be served hereby citations to the record, that defendant on its 2-high mills was able to roll strip and foil to gauges as thin as any produced on the accused mills.

This case has the novel aspect that with the possible exception of width, defendant could, on mills, which were not accused of infringement, produce products as thin or thinner, of comparable length and of better finish than those achieved by the accused mills.

### Reduction Per Pass
### and
### Elimination of Buckling and Wrinkling

In their argument before the Court, plaintiffs advanced the position that defendant, by use of the accused mills, obtained heavier reduction per pass than on the prior art mills and even on the Alcoa, up-to-date mills. This position was based in part upon claimed "admissions" of greater reductions per pass by defendant at three places in its main brief before the Master, namely, at pages 82, 122 and 126, and by comments of the Master at two places in this Report, namely, 49, 50 and 51 and again at page 97.

We have examined these references with extreme care. In our opinion, the so-called "admissions" were taken out of context and for the sake of perspective we incorporate the following from defendant's brief at pages 82 and 83:

"The futility of the attempt of plaintiffs to confuse these subjects of speed, which is not obtained by defendant by the use of the combination of rolls and bearings which plaintiffs here accuse (supra pp. 64–78), with width and with heavier reduction per pass, both results of the use of backing rolls and known long prior to Steckel's alleged invention (supra pp. 20–2) is exposed by the following comparisons:

"Compare the accused 42″ Edgewater 4-high mill, which rolls at

speeds up to 600 feet per minute and at widths not greater than 39 inches (Appn. p. 65), with the 24 x 48 Edgewater 2-high mill, which rolls at speeds up to 1200 feet per minute and at widths up to 42 inches (Appn. p. 63). In this case the 2-high mill rolls wider width at twice the speed because it was built to go faster and is a wider mill. *Yet, of course, the 4-high mill takes a heavier reduction per pass because it has a backing roll;* or

"Compare the accused 60″ Edgewater 4-high mill, which is flood cooled and which rolls up to around 300 feet per minute and in widths up to 52 or 53 inches (Appn. p. 64) with the 60″ wide 2-high (No. 7) mill at Alcoa West Plant, which is not flood cooled and which rolls up to 50 inches wide at speeds of 200 to 300 feet per minute (Appn. p. 47, 49) and both of these mills with the 60″ wide 2-high mill at Alcoa North Plant, which is flood cooled and which rolls widths up to 52½ inches wide at 1200 feet per minute (Appn. pp. 56, 57). All these mills roll about the same width and the 4-high mill and the West Plant 2-high mill roll at about the same speed, but the North Plant 2-high mill rolls at about 4 times the speed of the 4-high mill and the other 2-high mill. *Of course, again the 4-high mill takes the heavier reduction per pass because of the known function of its backing rolls.*" (Emphasis added.)

The portions we have emphasized are the parts relied upon by plaintiffs.

Again on pages 121–123 of defendant's main brief we observe the extent of the asserted admission:

"When plaintiff's counsel was examining defendant's experienced metallurgist, Hood, he noted the lack of advantages of the accused backed up mills from the standpoint of product produced and the problems attendant upon their use and proceeded to inquire as to why defendant didn't get rid of the mills. Hood answered (5802):

" 'A. Mr. Webb, we get greater reductions per pass with those mills and are enabled, with these particular mills—in the sizes in which they are purchased—have been able to produce wider coiled sheet. I have no other knowledge as to why we don't get rid of them.

" 'Q. What other advantages are there so far as the four-high mills are concerned besides those which you have mentioned? A. I can't think of any at the moment.'

"The accused North Plant 4-high cold strip mills did not in some respects turn out to be as efficient as defendant's older 2-high mills (supra pp. 72–3), and for that reason plaintiffs' counsel was prompted to ask Brooks, who designed many of defendant's accused mills, why defendant did not get rid of the mills. Brooks replied (10602):

" 'A. Well, Mr. Webb, we need those mills. That is the reason we bought them. The problem that faces me is to provide some way additional cooling facilities that are needed for extracting the heat from the body of the rolls as well as to devise means for more efficient handling of the coils around the mill. That is the problem that faces me.'

"Counsel then advanced the thought that the mills would do things 2-high mills would not do, and Brooks answered (10602–3):

" 'A. *They make heavier reduction per pass than the two-high mills, Mr. Webb.* That's right. That is the reason we bought them—prime reason.'

"And Brooks also pointed out as to the 4-high mills installed at West Plant, North Plant, and, later, at Davenport (10603–4):

" 'A. They were put in because *they wanted to make heavier reduction per pass on wide material.*

"'Now I point out to you, Mr. Webb, that we kept buying these four-high mills and we have also been investing in two-high mills. And there is a good reason why we do that also. There isn't any one mill that is the answer to all the problems.'" (Emphasis added.)

And again on pages 126 and 127 we note that defendant's "admission" was heavily qualified:

"The evidence is thus clear that defendant had installed these accused mills to obtain the specific known advantages which are imparted to a backed up mill by the known fact that the backing roll minimizes deflection of the work roll and therefore allows of the taking of a greater reduction per pass and the rolling of a wider width at strip rolling reductions with a minimum of deflection. That such functions were known and in the public knowledge prior to Steckel's alleged invention is beyond doubt (supra pp. 20-3).

"As the evidence shows, these are the only advantages which accrue to defendant by reason of the use of these accused mills and processes.

"The only advantages of the accused mills to the defendant were the heavier reductions per pass and the wider metal which could be rolled on these mills by the coiled sheet process. Both of these advantages accrued to defendant because of the use of the backing roll and the consequent decrease in deflection of the reducing roll (Nagel 5221; Kessler 6941-2; Heilman 9163, 9280, 9285; Hood 5721, 5802; Brooks 10602-3; Jolly 781). There are disadvantages as to the surface finish (supra p. 91). There are some other disadvantages which flow from the fact that the accused backed up mills are used to obtain heavy reductions per pass. Because of such heavier reductions the uniformity of gauge is not as good on the accused 4-high mills as on the 2-high mills (supra p. 94),

and likewise superior flatness is secured on some of the 2-high mills (infra p. 183, footnote).

"But, as the evidence shows, and disregarding here these disadvantages of the accused backed up mills, *there is no difference in function and result between rolling aluminum and aluminum alloys on a 2-high mill and on the accused backed up mills, except the greater reductions per pass of the backed up mill.* The situation as to increased width of rolling is governed by the prime consideration of reduction per pass. This is forcefully brought out by the witness Nagel, who was asked to say that even if the defendant's 2-high cold strip mills of 1923 had had the advantages of the improvements of later years, they still would not have produced the widths of the accused 4-high mills. Instead Nagel stated (5543-4):

"'A. No. No. Take our 60 inch mill. Had we had it equipped with all these bridling equipment to use that mill to its widest width, see, we would have produced just as wide on a two-high mill as on the 60 inch four-high mill at Edgewater, see. It would take more passes, of course, for a given reduction. Now, of course, when we went to the 72 inch wide mills at North Plant and the one tandem stand 72 inch wide four-high mill at the West Plant, we could then, of course, produce a wider sheet than we could on a narrower two-high mill. But that is not because it is a four-high mill or two-high mill. If we have a 72 inch two-high mill—and unfortunately we don't—we could then produce just as wide on a two-high as on a four-high mill. One big difference would be it would take more passes to give the same total reduction. The quality would be the same.'" (Emphasis added.)

Now, turning to the Master's comments on the subject of reductions per pass.

At pages 48–49 he summarized the testimony of witness Torrence as follows:

"Defendant's witness T. A. Torrence also testified with respect to foil rolling, that defendant acquired the 42″ 4-high mill because of its ability to give greater reduction per pass (6132) and greater widths (6134); also that the defendant by this mill was enabled to continue to use the same size work roll as on its 2-high mills (6134) and get greater reduction. The 4-high mills did not change the nature or necessity of the pack rolling process at all (6140)."

On pages 50–52 he summarized the testimony of witness Brooks:

"Defendant's witness Brooks, who wrote the design specifications for various of the accused mills, chose the 4-high mill because of its backing rolls which made it stiffer and thus able to make a much heavier reduction per pass (10,283). He said that the heavier reductions at faster speeds made by 4-high mills necessitates more gallons per inch of roll face of flood cooling and also greater nozzle pressure (10,285). The defendant is unable to take advantage of the knife edge effect of very small work rolls because of the inability of small work rolls to receive metal of the entering gauges which defendant wanted its 4-high mills to handle. This involves the so-called 'bite angle' discussed by Brooks at 10,313, 10,317–8, et seq.

"Brooks pointed out another consideration preventing decrease of the work roll size, that of the tortional shear exerted against the roll neck of the work roll by the power applied to it in rolling. Too small a work roll means a roll neck too weak to withstand this shearing force (10,314, 10,323). He discussed the bite angle and the tortional shear as dictating the choice of size of work roll in a 4-high mill (10,325, 10,327). In considering the tortional shear problem it must be taken into consideration that the mill may be operated with a 3-roll coiler and therefore without forward tension and so strength in the work roll neck must be provided without the assumption that there will be any forward tension.

"By way of summary, from the above it appears that the defendant found 4-highs desirable for certain operations because of their superior rigidity, which resulted in greater reductions per pass, decreased the amount of crown needed in the work rolls, and made possible somewhat greater widths. But the full theoretical potential of the 4-high principle was not available to defendant in that small work rolls would not receive the strip, and their necks could not withstand tortional shear forces which might be expected."

And on page 97 he summarized all the evidence with respect to reductions per pass:

"These 4-high mills simply did what backed-up mills have always been capable of doing—taking greater reductions per pass and rolling wider widths—and they did it faster than before, because better bearings were used, assisted by better cooling aids."

The above quotations index the uncertainties we get into in seeking clear-cut support for the asserted economies and advantages of 4-high mills with non-friction bearings. In the record we find evidence by defendant: that there was more waste of metal in 4-high heavy reduction rolling than by 2-high rolling; that the small work rolls claimed by the patent were unusable in the primary reductions because they could not receive the heavy gauges fed to them; that small work rolls could not withstand the tortional shear generated by heavy reductions; that the accused mills were not usable at high speeds without flood cooling; that the accused mills were not satisfactory without back tension; that once the sheet was seized by the rolls,

the accused mills were speeded up, and this made for unevenness in the quality of the product; and, that the accused mills could not be used for the best finishes.

In dealing with the claimed advantages of the 4-high mills which plaintiffs emphasize produced greater reductions per pass, we shall consider the associated question whether the accused 4-high mills with their anti-friction bearings were instrumental in eliminating buckling and wrinkling in the strip as it passed through the mill. It seems to the Court that these two asserted advantages are especially interrelated, although it recognizes that, to some degree, it will again get into questions of width, speed, etc.

It needs no elaboration that the use of non-friction bearings had its own impact upon the running of a 4-high mill. But whether the combination of the non-friction bearing with the mill with backing rolls produced, in itself, advantages in the rolling of aluminum sufficient to sustain a charge of infringement, is another matter.

Howard E. Corbitt, a roller in the defendant's mills since 1929, who operated the accused 42″ foil mill at the Arnold Plant on one of the inspections, testified by deposition for the plaintiffs. His testimony was that the speed of a mill depended upon the viscosity of the lubricant and the finish on the roll; that the faster the speed and the lighter the lubricant, the more unwind (or back) tension that was needed. Without the unwind tension, little holes might be chewed in the edges or center of the strip, and he indicated that the unwind tension might be adjusted by hand during the rolling of coil. "If the metal is coming too light, you can loosen up; if it is coming too heavy, you can tighten it. You can use more unwind tension or cut it down, if it is light. In other words, you are helping to control your gauge." The unwind tension was varied with the gauge desired and to stop the chewing, and also the amount of tension was varied with the dullness or brightness of the rolls. Again, "The more tension you have, the

more reduction you get, but you cannot have too much, or it will break feeding into the mill." He testified, that the speed of the mill depends upon the roller himself, that if he tried to make a schedule he would roll as fast as he could; but that if he had gotten too much reduction on a previous pass, he would roll the next one more slowly to compensate. He remarked that the more tension on the unwind, the slower the speed.

Regarding the lubricant, his testimony was that it took a different lubricant for a pack pass and a split pass—and that if a wider material were used, it would require a heavier lubricant. He testified that the viscosity didn't vary too much; that if it was too light, it would burn (a scaling condition which looked like chickenpox) and if too heavy there would be too much reduction.

Upon being asked at what speeds he would roll a strip 31 inches wide, he answered, "Here comes the finish on the mill and the viscosity of the lubricant. You can't get away from it, gentlemen; that's all there is to it." On a bright mill, he testified, they would do well to get 250 feet a minute. A dull roll would roll faster, perhaps 100 to 150 feet per minute faster. Regarding a novel compressed air multiple bridle on the entry side of the mill he said, "Yes, we used it. You have to bridle your metal as it enters the roll because it will fold over for you on the end of the mill, and it might have a buckle in it * * *." His testimony was that they always used an electric unwind reel.

On cross-examination, he observed in connection with burning that the operator could turn water into the lubricant to cool it, and if necessary could turn steam into it to heat it. Water was also used in the neck and bearing lubricant. He said he had run the mill as high as 750 feet a minute, but was afraid the motor would spark at high speeds. He rolled at slower speeds of 250 feet per minute. Speaking of the oiling lubricant, he testified that it sprayed right on the roll, and that there are valves which may be used to adjust the spray.

"We very seldom touch them unless we are getting too much spray and it will slop out on the metal and come back on the floor. On the top, you might be running a hot spot and you turn on more oil and the hot spot will give you a buckle in the metal, and it will pull up, and you have to use too much rewind tension and it will break. That lubricant coming on the roll has a great deal to do with keeping the right shape of the roll." Again he testified, if the viscosity of the lubricant was lightened, the reduction on the mill was less; if the oil was cooled the viscosity became heavier and the reduction went up. With regard to screw pressure on the rolls, he remarked it was not used to pull gauge but to keep the metal flat.

Frank Naccaroto, a roller for the defendant for over 25 years, who sometimes operated the accused 34″ foil mill at the Arnold Plant, testified by deposition for the plaintiffs. This mill, he testified, averaged about 500 feet a minute, from a lower range of 300 feet per minute to about 700 feet. This witness was not as articulate as Corbitt, but his testimony as to the necessity of unwind tension was quite similar to Corbitt's. "If you feed a mill two rolls * * * you got to have the tension in the back so it will hold that flat. If you don't have enough tension, that metal don't go in flat; it just chews and chews in the center, or chews in the side. You have to have enough tension to bring it in without cutting." ("Cutting" with another name for "chewing".) With respect to speed at the start, he testified that the mill was not set at a particular speed until he got the gauge. "After we get the gauge, we have to have a certain speed to get the gauge and, once we get the gauge, we give and take—if it is too light or too heavy." The speed was altered by use of a rheostat. When the gauge was light, they slowed the mill down, and the strip went slower, too. As to the back tension, he testified there has to be tension to bring the metal through flat without cutting. He said it takes skill to keep the metal flat. The screwdown on the bearings was to force the rolls together and level it down, otherwise, one side will come out straight and the other wavy. He said that it takes twenty-five years experience to get the metal to come out level. With regard to speed, he testified the first button was 300 and it would run up to 700. He rolled at the speed required—"if your metal requires no more than that, that is where you roll". If the metal is light, less speed is used.

On cross-examination, he testified the purpose of the re-wind was to coil the metal tight, and that if it is not tight, the next roller will have trouble because the metal will not come out flat on the unwind. As to the part heavy and light oil play in the reduction, if the viscosity was right, they turned the sprays on for cooling purposes right straight across. But if the strip does not come out flat and there is a hot spot, he testified "we work our spray across." A hot roll will not reduce the gauge so much while a cooler roll pulls more. He testified they did not run the mill as fast as they could because they had to get good work out. If they ran too fast, the mill would get hot and the next fellow would start kicking.

This testimony as to the unusual freedom accorded individual operators in fixing the speed, and in making other adjustments, of the mills in operation, is confirmed in a large measure by the testimony of Otto O. Holt, Supervisor of Cold Rolling for defendant at its Alcoa North Plant. He was plaintiffs' witness and testified on direct examination as follows:

"A. * * * We don't have any given speed for any one alloy or any one gauge or any one width. We don't have set speeds for that. We have a number of operators and you might find one operating at one speed and another one at another speed.

"Q. You said that the operators went to the foreman for advice in operation, am I right on that? A. That is what he is for.

"Q. Does that include the operation of the mill, such as the speed, reel pull and pull on the reel if they are using a reel on those mills, and so on? A. No. He doesn't necessarily go to him for that.

"Q. Could he go to him for it? A. He certainly could.

"Q. And within your knowledge have they gone to the foremen with such questions? A. As to speeds * * *

"Q. Just as an example, speeds and air pressure. A. No, not to my knowledge they haven't.

"Q. You mentioned that for any given alloy there was no set speed. Is there a range of speed in which the operators roll a particular alloy? A. Not a set range.

"Q. Well, actually, do they roll it within a range of speed? A. They usually do. You will find a certain operator, he will usually have his speed to make quality and then another one will have his speed where he can make the best quality, and we don't try to push them around on that.

"Q. When the individual operators have their speed for making quality as you put it, do they usually run the material at that speed? A. They try to run, as I say, they run whatever they think they are making the best quality of sheet."

Wiley G. Hayes, Foreman on the 4-high at defendant's Alcoa North Plant was plaintiffs' witness. Under cross-examination, he testified as follows with respect to flood cooling.

"A. * * * at the beginning we had spigots on there that would throw the oil in at a vertical position on the rolls and they were too wide apart and we did not get as good a cooling system from them and we took it out and put a solid spray bar on and put the sprays closer together.

"Q. When did that happen, do you recall? A. No

"Q. Was that kind of a change made on the spray bar on the A and B Mills? A. On all of them.

"Q. They made it all about the same time, did they? A. Close together, yes.

"Q. What do you use that oil for? A. To cool the rolls with so we can roll metal.

"Q. *If you don't cool the rolls with that oil what happens?* A. *You couldn't run a sheet, it would break it, it would get too hot, it would break and buckle up, couldn't run a sheet they could sell. You just couldn't run a coil through it on light gauge.*

"Q. Let's go back now to the time this was a wartime plant and about a year after that. Did you always have enough oil in your mill then to keep the mill cool? A. There has been cases where it has got too hot to roll. I mean, you would have to cool out without metal in it. Sit there and maybe let her cool for a minute before you could roll. That goes up to now, too." (Emphasis added.)

Joseph H. Cline, another employee of defendant who was a witness for plaintiffs, was a foreman of the 4-high mills in the Alcoa North Plant. He testified on cross-examination that when he was an operator he used his own judgment as to speed, reel setting, tension bar and bridle settings. He stated also on cross-examination that oil was used to control the heat, that all operators operated differently and that the amount of tension on the bridle depended upon the gauge of the coil being run. He emphasized that when he operated a mill he looked first to the sheet rather than the instruments, and that good sheet can be made in different ways.

J. Sanford Self, a foreman on the 4-high mill at the North Plant, testified for defendant if he were rolling metal at 500 feet a minute, and the mill were heating up, he would speed the mill to 600 feet, not to increase the quantity of

oil, but that speed seemed to spread it more evenly over the rolls. On cross-examination, he observed that in the first five minutes of a run they cut the oil out of the center and turn the oil on the edges. This draws the heat to the center, and as soon as the sheet leveled off he would begin to add oil to the center.

We have reviewed the testimony of Corbitt and Naccaroto in some detail and of other rollers and foremen in lesser detail. Corbitt and Naccaroto were rolling mill operators upon two of the accused mills of defendant and had a combined employment of over fifty years with that company. Moreover, they were plaintiffs' own witnesses. We think it rather singular that they were not questioned about the non-friction bearings—in view of testimony that hot spots in the rolls were reduced by changing the temperature of the lubricating spray. This omission and their testimony compels the conclusion that flood lubrication and back tension play a major role in the rolling of aluminum. We think that these operators, who out of their extended experience played the various controls on these complex machines almost like the keys of an organ, had an insight into their operation of exceptional importance to the Court in this highly ramified case.

Mr. Lloyd L. Wilson, chief engineer for the Cold Metal Products Company, was a witness for plaintiffs. He testified that he took a course in mechanical engineering at Pennsylvania State College, but left school and started to work for Carnegie-Illinois Steel Company. He then went with Sharon Steel Corporation in 1919 and continued with them in various capacities including assistant works manager and works manager until 1947 when he went with the Cold Metal Company. In plaintiffs' main brief before the Master, his testimony was emphasized that *in the steel industry*, the coil was fed freely into the mill from a coil box *without back tension*.

On cross-examination, Wilson was questioned about his testimony that in an inspection he had found crown in the sheet from a 4-high mill. The following colloquy took place:`

"Q. Well, now, if you have a little less crown on a four-high mill product than you have on a two-high mill product, that is a difference in degree, isn't it? A. If you have a crown from a four-high mill and roll the same material on a two-high mill and you get a crown, the answer is you get a difference of degree, but I don't think that the statement you have made makes a rule, or states a rule.

"Q. You can't state a rule for all metals, can you? A. No, you can't."

Further, in regard to the same subject of crown, he was asked whether his opinion was based upon experience in rolling aluminum. He answered, "No, they are not based on experience in rolling aluminum any more than what I have seen and picked up on this trip * * * "

On cross-examination, he was asked about a statement he had made on direct that "scrap losses in those days were much greater than they are today." The following is taken from the record:

"Q. The scrap losses you were talking about were scrap losses in cold rolling; is that right? A. The scrap losses in the pack mills was from the operation of rolling from the hot sheet, rolling it hot, finishing it up by cold rolling, if you like.

"Q. In other words, you were trying to compare scrap losses in hot rolling with scrap losses in cold rolling, weren't you? A. That during the scrap losses in producing a certain gage material on the old pack mills versus producing the same gage of material on either the hot or cold mills of today.

"Q. You weren't speaking of aluminum or aluminum alloy when you made this statement, were you? A. No, I was not.

"Q. *You don't want the Court to infer that was the case in the aluminum, do you?* A. *I don't know what the picture was in aluminum in the old days.*

"Q. *Do you know what it is today?* A. *Not too well.* Not as well as I would like to.

"Q. What are the scrap losses? What were the scrap losses in rolling aluminum cold rolling in the period 1939 to 1947 inclusive? A. I don't know." (Emphasis added.)

On the question of the detrimental effects of roll-neck heating, he testified as follows:

"Q. It is true, isn't it, that in a two-high mill, as far as neck heating is concerned, that any detrimental effect from the heat will be felt immediately as the heat flows into the two-high roll body, whereas in the four-high mill the heat has a much longer path to travel, is that not correct? A. It is a more tedious path. Offhand, in general, yes. The same temperature applied to two-high mill would be felt more quickly than it would in four-high mill.

"Q. So you might say the mill would be a little more sensitive? A. Two-high?

"Q. Yes. A. I would say so."

With respect to heat from the backing roll necks, he agreed with defendant's counsel that the ends of the roll body would swell and the heat would gradually move in and cause some swelling in the center and that if the bearings continued to feed heat to the roll it would probably be hotter toward the end of the barrel than at the center. In this situation, he was asked how he would get a buckle. He then qualified that a buckle is not necessarily found at the center of a strip, but that if a buckle ran down the center of a strip that "normally" it would be unrelated to roll neck heating. He was then asked whether the limitation of a rise of temperature in backing roll necks of the accused mills woud not lead to substantial buckling in the center of the sheet if some way were not found to control the temperature of the center of the backing roll because of the heat given off by the rolling. He replied it could probably be offset by use of a flood coolant. Then this occurred:

"Q. In other words, these defendant mills wouldn't operate unless it [flood cooling] was on, would they? A. It would be better to have it on there.

"Q. Tell me, would they make commercial sheet if they didn't have flood cooling? A. *I don't think so.*" (Emphasis added.)

Asked about oil cooling systems (not a part of the combination) on the necks of the roller bearing backing rolls on accused mills, Wilson testified, "It is not just the oil alone that does the cooling; it is not perhaps just the bearing alone, it is a combination of the two * * *" Asked if a roller bearing would have a low coefficient of friction if the oil were not there, he stated, "It might have it for a period but not for long."

Interrogated about Steckel's original mill, he testified that a large quantity of oil was used as a strip coolant, and that the mill would probably be inoperative for any prolonged length of time unless it had flood cooling or took a light reduction. He admitted on cross-examination that if buckles and wrinkles were prevented it made no difference what kind of a bearing was used except in the matter of cost and convenience, production, quantities and hours involved.

Wilson's knowledge of aluminum rolling was limited to that obtained on the date of inspection of defendant's plant. Asked what he considered high speed in the field of aluminum rolling, he replied on the basis of what he observed and from what he knew about rolling steel "any speed over * * * 300 feet a minute would be relatively high" and

agreed that high speed was a very indefinite term. Further:

"Q. Did it occur to you at all that perhaps the cooling capacity wasn't high enough to permit it running any faster? A. Well, I did, I remember one of the mills particularly, having the thought that that either might add more flood coolant or better control that which you had to get better productive speed or better productivity.

"Q. So there again the bearing used in the mill was not the limiting factor and it was this amount of flood cooling, wasn't it? A. It may have been."

He conceded that the operator of a mill is a large factor in the success of a particular mill, and that rolling takes practice, skill and experience. He further admitted that he would expect the testimony of the operators to be better than his own on the operation and reasons for operation of defendant's mills (including shutting down the mills to cool them off) provided the operators "would answer the questions and tell the truth".

Plaintiffs, in their main brief, also referred the Master to the testimony of Alonzo B. Montgomery on the question of the need for back tension. The reference is an erroneous one. Montgomery did say on the previous page of the record that in "most all mills" the heaviest reduction is usually taken on the first mill, and that the strip is fed to the rolls from a coil box with no tension excepting side guides and maybe light brand guides. Since he was referring to "most all mills" and not to a specific mill, and since he had spent most of his time in the steel industry and had only worked at irregular intervals and for limited periods early in his career in the aluminum industry, the Court has no way of knowing whether he was referring to steel or aluminum or was attempting a generalization as to both. His testimony was also offered by plaintiffs on the subject of flood cooling—to

the effect that flood cooling becomes "more necessary" as mill speeds and reductions of metal are increased on a mill, its purpose being to remove the heat generated by the reduction of metal at a rate that is equal to the input of heat into the rolls during the rolling operation. He testified: that bearing heat is entirely different from heat generated from the rolling operation; that heat from the necks will penetrate the end of the roll and cause an overrolling of the edges of the strip; that overrolling will wrinkle the strip on the edges and can't be controlled by flood cooling because the heat transfer is not uniform over the portion of the roll that is working on the material. He summed up: "The heat in that portion of the roll is coming from a frictional contact in the neck which is entirely different from the heat generated by rolling."

The testimony from these two witnesses is not convincing. Mr. Wilson's testimony was straightforward, but his experience had been almost, if not entirely, in the steel industry and certainly the force of his testimony as to what went on in the steel industry must yield to the testimony of men like Corbitt and Naccaroto, each of whom had been rolling aluminum for over a quarter of a century. The Master rejected the testimony of Montgomery on the subject of forward tension on the ground that he lacked the qualification to give the opinion expressed. The Court has read at great length the testimony of Montgomery on direct and under cross-examination. It came independently to the same conclusion. Neither by training or experience, nor by clarity of his testimony did Montgomery exhibit convincing qualifications for acceptance by the Court of his opinion on the subject of heat control in aluminum rolling over the testimony of those who had lived with it for a quarter of a century. We are not persuaded that there is any difference in bearing heat, or ingot or reduction heat except in its origin. To paraphrase Professor Trinks, "Heat is heat." Even Montgomery admitted on

cross-examination that flood cooling can cure a "certain amount" of overrolling if it is applied to the cold aluminum or alloy at proper locations on the roll.

In their reply brief before the Master, plaintiffs conceded that tremendous heat is created by the reduction of metal, and that this heat, if not removed, will, of course, affect the shape of the rolls. But they reiterated that roll neck heating must also be taken into account, and cited the following testimony of Professor Trinks:

> "Will you please tell us the correct situation in regard to the influence of the coefficient of friction on the performance of the mill from the standpoint of the flatness of product?
>
> "A. In my last answer I stated that the high temperature of the bearings swells the rolls at the ends. And therefore produces wrinkling or riffling at both edges of the strip. Of course that can *to a certain extent* be counteracted by flood cooling, particularly so at low speeds. But as the speeds become higher and higher, it becomes more and more difficult to get the right temperature distribution in the roll." (Emphasis added.)

Professor Trinks was graduated from the Royal Institute of Technology in Berlin, Charlottenbury. He held a few early positions but in 1905 became professor of mechanical engineering and head of the Department of Mechanical Engineering at what is now Carnegie Institute of Technology, a position he held for over 35 years. He was a singularly lucid and candid witness.

On cross-examination, he testified that by high speed mills he meant mills going over 1000 feet a minute and that he did not realize that the 4-high mills talked about in this case rarely ran over 800 or 900 feet a minute.

On cross-examination, the following colloquy took place between Professor Trinks and Mr. Keith, one of the counsel for defendant:

> "Q. Let me ask this. If a mill were rolling thin material day after day to commercial shape at a reduction of 70 per cent per pass, and the metal was being delivered at the rate of 450 feet per minute, would you say that that mill had an antifriction bearing on its load bearing necks? A. *What metal are you speaking of?*
>
> "Q. *I thought you said somewhere in here that metal didn't make any difference, that force was force?* A. Wait a minute. I said that metal didn't make any difference with regard to the capacity of a bearing. I said that force is force, that the bearing is designed for a given force and not for rolling aluminum or high carbon steel. But when you asked me this last question, *then 70 per cent reduction in aluminum isn't the same as 70 per cent reduction in high carbon steel.*
>
> "Q. *Did I say anything about aluminum?* A. *You didn't, but I asked what metal.*
>
> "Q. *I am asking you a question. Can't you answer that question without knowing the metal?* A. *No, because you said 70 per cent reduction, 600 feet per minute—*
>
> "Q. *I said 450.* A. *Pardon me, 450 feet per minute, rolling commercial shape with 70 per cent reduction, and 70 per cent reduction in high carbon steel or stainless steel gives a very, very much greater force than magnesium, for instance.*
>
> "Q. *Well, my question is, can you answer that question without the metal being stated?* A. *I cannot.*" (Emphasis added.)
>
> \* \* \* \* \* \*
>
> "Q. \* \* \* *If a mill rolls thin material day after day to commercial shape, and the metal is delivered at the rate of 450 feet per minute, and the reduction that is being taken is 50 per cent reduction per pass,*

*would you say that the mill had an anti-friction bearing on its load bearing roll necks? A. Well, it may be possible to do it without an anti-friction bearing in soft metals such as magnesium, aluminum, leaded brass, but it would have to have an anti-friction bearing if, for that reduction, hard metals, such as high carbon steel, were rolled.*

*"Q. If a mill were rolling thin metal day after day to commercial shape and the metal was delivered at the rate of 360 feet per minute, would you say that that mill had an anti-friction bearing on the load bearing necks of the roll? A. It can and it cannot. At that speed you can possibly get along with (sic) an anti-friction bearing, if metal is soft."* (Emphasis added.)

Again on cross-examination, he testified as to the functions of roller bearings as follows:

"Q. The functions of a roller bearing, whether that bearing appears on industrial shafting or on the necks of rolling mills or for any other purpose, were known, were they not, prior to 1922, to be three-fold: The saving of power, the permitting of higher speed without as much heating, and the reduction of bearing wear?

\* \* \* \* \* \*

"A. I do not know because I do not know whether the roller bearings were used \* \* \* oh, yes, you are right; they were known."

Again on cross-examination, he testified:

"Q. Now do these things that you call anti-friction roller bearings have any other function on any rolling mill other than this power saving, *not quite as much heat* at faster speeds, and this resistance to wear? A. They can also take up end thrust, axle thrust of the roll.

"Q. That is a certain type can do that? A. Yes.

"Q. But my question, if it was not clear, is directed to these anti-friction roll bearings you have been talking about which go on the roll necks. *When they are on the roll necks, the load bearing roll necks, do they perform any other function than the ones that I have named? A. No. No, no other function."* (Emphasis added.)

Plaintiffs offered the testimony of Noble Jones who spent virtually his entire career in some phase of the steel industry. With reference to the accused cluster mill (Mill "S") he testified that the cage type roller bearings on this mill "contributed in a major way of limiting the heat and act as a substantial means, a very substantial means of controlling the heat of the mill. \* \* \* In the necks of the rolls, consequently in the mill itself." He also observed the accused hot mill in action, observed that the backing rolls had cage type roller bearings which contribute in a major way to heat control of the bearings.

On cross-examination, he was asked about the accused Edgewater 34″ foil mill (Mill "P") and whether he had observed that the backing roll bearings had a cooling lubricating system. He answered that he had, and volunteered that the bearings play a big part in the control of heat. When asked how much of the heat was taken by the bearings and how much by the cooling system, he said he didn't know. He was then interrogated on the flood cooling system for the rolls themselves, and replied, " \* \* \* lubrication plays a part, there is no question about that, but if you didn't have the bearings there, no matter how much lubrication you would throw in there, I doubt very much if you could roll commercially." On further cross-examination, he admitted that the bearing cooling system helped a lot. With regard to back tension on one of the accused mills, he admitted that the strip to which it was applied was very thin. To the question whether he had

ever seen anything rolled as thin as that before, he responded:

"I have never seen aluminum—wait, I will take that back. I saw some aluminum rolled at the plant in New Kensington years ago, but I don't recall what gage it was. * * * "

He recalled that he had seen steel rolled one-thousandths thick but that the aluminum he had observed was 2½ tenthousandths. Asked about the extent of the observations upon which he based his judgments with respect to the accused mills, he said he had examined ten mills in one day. Asked if he was accustomed to forming judgments about mills from such limited observation, he answered, "We prefer longer times, but apparently we were only given that much time, and we had just so much to do and we crammed in everything we could." He was then asked if he had not been an operating man at one time and how much time he would need in the observation of a mill to draw a conclusion about it as to the job it would do in his plant. To this question, he testified " * * * after listening to the testimony, I think, from some of your superiors * * * I think a lifetime would be necessary."

In the light of the testimony of Corbitt and Naccaroto as to the time it takes to master a mill, of Holt's testimony of the freedom in operation of a mill accorded such operators, and of Professor Trinks that metals have great differences, we are forced to conclude that the above and other testimony of Mr. Jones, which we have reviewed, is too sketchy and has much too limited a base to have persuasive value with the Court in resolving the problems with which it is faced.

In its reply brief before the Master, plaintiffs relied upon a purported admission of John H. Hitchcock, Director of Research for the Morgan Construction Company, as evidence of infringement. Hitchcock was defendant's witness who was cross-examined by plaintiffs as to the accuracy of certain statements about Morgoil bearings appearing in a publication of Morgan Construction Company issued about September, 1938. The cross-examination of Hitchcock took place in December, 1953, over fifteen years after the publication issued. Hitchcock in 1953 disagreed with many of the statements with which he had concurred in 1938. It was in the course of this cross-examination that Hitchcock made the evaluation upon which plaintiffs rely:

" 'Six years of experience in actual operation under many varying conditions have proved the efficiency of Morgoil bearings, the bearings which ride on a film of oil and are outstanding in giving a better product, greater production and at remarkable savings in power and maintenance costs.'

"I agree with the first part of this with respect to the six years of experience of operation.

"I agree with the phrase 'ride on a film of oil' as long as we confine our definition to conditions of operation in which hydrodynamic lubrication is maintained.

"The last clause of outstanding in giving a better product, greater production and the remarkable savings in power and maintenance costs is correct in reference to the old conventional babbitt and bronze bearings."

In the opinion of the Court, plaintiffs, in relying upon this statement offend for the same reason they criticise defendant—namely, of relying upon an encomium, not of the combination upon which they sue, but of one of its parts. This testimony, although confined to Morgoil bearings presumably is cited as evidence that any bearing with a low coefficient of friction would have an important effect "in giving a better product." We have already noted that the use of non-friction bearings undoubtedly had an impact upon the smoother running of a four-high mill. But we noted also that the attainment of such

an advantage is different from attributing the same advantages to the operation of the combination. Moreover, Trinks, as we have observed, admitted in his testimony that roller bearings were known prior to 1922. Apart from the fact that it is the combination which must be infringed, an inference of the efficacy of roller bearings from this acclaim of the Morgoil bearings, is, in the light of the holding of the Court of Appeals with respect to Morgoil bearings in the Bliss case, supra, a *non sequitur*.

Hitchcock testified that the character of the product, such as its tolerance, accuracy and precision, is not vitally affected by the type of bearing on which the rolls are mounted, whether Morgoil, grease lubricated bronze, grease lubricated babbitt, or oil lubricated babbitt.

He further testified with reference to the so-called "bite angle",

" * * * if the material coming up to the rolls first contacted the rolls about at their centers, representing a bite angle of 90 degrees between the vertical center line and the point where the material first strikes the rolls, the material wouldn't enter the rolls at all. The bite angle has to be small enough so that the friction available between rolls and material will draw the material into the rolls in order to reduce it, and the bite angle necessarily depends upon the diameter of the roll for a given reduction. The bigger the roll diameter, the smaller the bite angle is for a given reduction."

Regarding roll heating he testified it is possible, if the temperature of the work roll is higher at the center, for the heat to flow from the work roll to the neck, because heat tends to flow from the warmer place to a cooler place. If flood cooling is applied to the center of the work roll, it may reverse the flow of heat and help protect the bearing. In cases where the roll barrel has expanded more at the center because of accumulation of heat, he testified the shape of the roll barrel could be restored by lowering the temperature of the middle of the roll or by raising the temperature at the ends of the roll in which latter situation increased generation of heat in the roll necks would be an advantage.

Relying upon evidence particularly called to our attention by plaintiffs in their argument before this Court and in the briefs before the Master and this Court, and most of it, except for Hitchcock and Self, being the evidence of plaintiffs' own witnesses adduced either on direct or cross-examination, the following considerations emerge.

Greater reductions per pass were possible with a backed-up mill. This, as Steckel observed, in 1932 was the result of stiffening the mill against roll bending. The working roll (or rolls) received more support and did not bend as much from the pressures to which they were subjected. It is so elementary that two sticks (or a bundle of sticks as was pointed out by the father in the old fable) are stronger than one, we cannot find in the provision alone of these backing rolls any new function. Plaintiffs concede this. Similarly an easier running bearing is better than one which is subject to friction. Plaintiffs also concede this.

But plaintiffs say the combination of frictionless mountings and backing rolls in a rolling mill produces a new function. Plaintiffs urge that it is the positioning and proportioning of them to function in the combination which is new. We have examined the record on this question with care. It is true that selected opinions of experts, who were distinguished by their unfamiliarity with the aluminum rolling industry, appear on the record to the effect that frictionless rolls on the accused four-high mills eliminated buckles and ripples in the strip being rolled. Taken alone, this evidence would have some weight. But when considered in the perspective of evidence by Corbitt, Naccaroto, Holt, Hayes, Cline, Self and others, and of their own fumbling on

cross-examination, the evidence is overwhelming that they were not experts in the field of aluminum. If it is too harsh to say that they did not know what they were talking about, it is accurate to say that with the possible exception of Trinks they knew so little about the problems and practices in the rolling of aluminum, their testimony carried little weight. There may, as the Master indicated, have been a minor unitary value to the frictionless bearings operating on the backing roll, but having examined the matter afresh, the Court is convinced its effect was minimal in the control of heat and of the diameter of the rolls. The controlling factors in the handling of this metal—one of the soft metals—was the expert employment of flood lubrication and back tension by men who were enormously versed and experienced in the rolling operations of this industry.

Plaintiffs place a desperate reliance upon the testimony on cross-examination of defendant's chief mechanical engineer, Moses Edward Brooks. The passages relied upon are:

"If the four-high mills were so lacking in efficiency as you indicated, why don't you get rid of them?

"A. Well, Mr. Webb, we need those mills. That is the reason we bought them. The problem that faces me is to provide some way additional cooling facilities that are needed for extracting the heat from the body of the rolls as well as to devise means for more efficient handling of the coils around the mill. That is the problem that faces me.

"Q. The reason you need those mills is because they will do things that your two-high mills with plain bearings or any other kind of bearing on them won't do; isn't that correct? A. *They make heavier reduction per pass than the two-high mills, Mr. Webb. That's right. That is the reason we bought them —prime reason.*

"Q. And you knew when you designed and specified the four-high anti-friction bearing mills for Edgewater and for your Alcoa plants that those mills would have definite advantages over any of the mills which you had at that time; is that not correct? A. I didn't know it when I specified those for Edgewater. That was a gamble, Mr. Webb. Those were the two first four-high mills that the company ever used for cold strip rolling * * *

* * * * * *

"Q. It was because of these definite advantages of four-highs over the two-highs that those mills were put in at these other plants? A. *They were put in because they wanted to make heavier reductions per pass on wide material.*

"Now I could point out to you, Mr. Webb, that we kept buying these four-high mills and *we have also been investing in two-high mills.* And there is a good reason why we do that also. There isn't any one mill that is the answer to all the problems." (Emphasis added.)

When this evidence is analyzed all that Brooks did was, to reiterate the known advantages, not of the patented combination, but of four-high mills— something that Steckel had noted years before. Brooks readily acknowledged the advantages of four-high mills, but pointed out there were problems in getting them to work properly in their special task of heavy reductions. The sweeping advantages claimed by plaintiffs for the accused four-highs are further brought into question by Brooks' testimony that even when defendant was installing four-highs, it was continuing to invest in 2-high mills, because no one mill would handle all the rolling jobs with which the aluminum industry was confronted. Four-high mills had a superiority in achieving reductions, but there was evidence that even these four-high mills with their vast cooling sys-

tems had limitations because of the enormous heats which were generated, and that they frequently had to be shut down for short periods to cool them off.

### Findings and Conclusions

On the basis of evidence herein reviewed by the Court, as well as the evidence called to its attention in the oral argument, in the briefs submitted on Objections to the Master's Report, and in the exhaustive battery of briefs prepared in the proceedings before the Master, and from the Court's trip with counsel for all parties to inspect accused mills located at defendant's Alcoa plant, this Court finds that the use of accused mills did not in the rolling of aluminum eliminate annealing and did not achieve any noteworthy improvement in working conditions. The accused mills did not achieve: substantially wider widths, any increase in the speed of operations of rolling mills, did not roll longer strips, did not produce a thinner product nor contribute any great economies in the use of power. The accused mills did accomplish greater reductions per pass but there is a failure of evidence that this result was accomplished by use of the combination in suit rather than by one of its elements—namely, back-up rolls. There is a dearth of credible evidence that the combination had any appreciable effect in eliminating buckles and wrinkles in the strip, and there is overwhelming evidence by defendant to the contrary.

The plaintiffs have not carried their burden of proving that the patented combination was instrumental in achieving, in the aluminum industry, the necessary benefits and results to support the charge of infringement of a combination of admittedly old elements.

But even if by some judicial *tour de force* it could be held that impressive benefits were obtained from the use of the accused mills, we find as a fact that those results were secured not by the patented combination but by additional elements—namely, flood cooling and back tension which were so skillfully blended in operation as to constitute a new combination.

The five accused mills used by defendant are different combinations from those appearing in the claims in suit, and are not infringements of patent '195 either under the doctrine of United States v. Berdan Fire-Arms Co., 156 U.S. 552, 15 S.Ct. 420, 39 L.Ed. 530, supra, or of Aluminum Company v. Thompson Products, 122 F.2d 796 (C.C.A.6), supra, or Gordon Form Lathe Co. v. Walcott, 20 F.2d 673, supra.

### Indispensable Party
### and
### Equitable Interest

■ During the course of the proceedings before the Patent Office, Cold Metal became involved in an interference with United Engineering & Foundry Company, the assignee of an application of Biggert and Johnson involving a common subject matter with the Steckel applications. Without repeating matter appearing in the opinions of the Court in the two Republic decisions heretofore cited, it is sufficient to say that at the time of the interference proceedings, Cold Metal and United on June 20, 1927 entered into an agreement to fix their rights to the common subject matter. Section 3 of the agreement, which is the basis for defendant's contention that United be joined as a necessary party to these proceedings, follows:

"3. When and if such claim or claims to common subject-matter are granted in any patent issued on Cold Metals' applications, Cold Metals shall grant to United a license to make, use and sell rolling mills under such claim or claims, which license shall be exclusive to United for 4-high hot mills and for 4-high cold mills, in which the major portion of the power required by a roll stand is supplied to the rolls directly and not through tension exerted on the material for pulling it through the rolls; Cold Metals, however, reserving the right to make or have made for its own use and

to use in its own plant or plants such hot and cold mills, and provided further that Cold Metal shall have the right to make, use and sell, or to license others to make, use, or sell, such 4-high hot mills in combination with means for coiling the rolled strip between passes as described in the pending application of A. P. Steckel, Serial No. 198,915, filed June 15, 1927."

We are here concerned, of course, only with patent '195, which combined backing rolls with non-friction bearings and in which the major portion of the power was applied to the rolls directly and not through tension exerted on the material for pulling it through the mills. Since we have held that '195 does not infringe, the matters might be considered academic, but defendant has vigorously urged the indispensable party defense and plaintiffs' lack of equitable title, and we think both should be considered. But to give either defense any standing, it must be assumed *arguendo* that patent '195 is valid and infringed.

The grant of a license for use of such a patent from Cold Metal to United was "to make, use and sell" 4-high hot and cold rolling mills under such claim or claims but "reserving the right" to Cold Metal "to make or have made for its own use and to use in its own plant or plants such hot and cold mills." In Waterman v. MacKenzie, 138 U.S. 252, 255, 11 S.Ct. 334, 34 L.Ed. 923, the Supreme Court differentiated three possible grants, (1) of the whole patent comprising the exclusive right to make, use and vend the invention throughout the United States, (2) of an undivided part or share of that exclusive right, or (3) of the exclusive right under the patent within and throughout a specified part of the United States.

What was granted under the language of the Agreement quoted above does not appear to have been an exclusive grant to United. In Cold Metal Process Company v. United, 132 F.Supp. 597, 603, D.C.W.D.Pa., in a suit involving the royalties to be paid by United to Cold Metal, the Court observed "that the 1927 agreement did not give United rights coextensive with the scope of Patent 1,779,195." And plaintiffs point out in their brief that the "exclusive" right under the contract of 1927 did not include (1) cluster mills, (2) 4-high mills made by or for Cold Metal for use in its own plants, and (3) reversing hot mills of the 4-high type.

In passing it should be observed that in Cold Metal v. United, supra, the Court noted that the Court of Appeals for the Third Circuit, in a case involving the same parties, 190 F.2d 217, 219, had said with reference to royalties:

"In substance it had been determined that United had an exclusive license from Cold Metal to make, use, and sell the four-high mills covered by the 1927 agreement and that United should pay royalties to Cold Metal in an amount to be determined by the court below."

The Courts of this Circuit have in the Bliss and Republic cases likewise considered that there was an agreement between the parties for royalties. In those cases damages were limited to the stated royalty for which United would have been liable to Cold Metal under the terms of an exchange of letters following the 1927 agreement. Damages were allowed Cold Metal in the Bliss and Republic cases even though United was not a party. But it is open to argument that the indispensable party defense was not raised in those cases.

In this case, the Master ruled that United was an indispensable party on the ground that, because of the dispute as to the amount of pull used in drawing the strips through the mills, United was in a posture antagonistic to Cold Metal and should have been made a party to protect any rights resulting to it from a determination of the percentages of power used in the reels and on the rollers proper. But patent '016 which involved forward tension on the strip has been removed from the case. The Master's reasoning is, therefore, not applicable here, since the claims in suit

of patent '195 do not specify that the principal source of power shall be the forward tension on the strip.

The question whether United is an indispensable party would seem, therefore, to be governed by ordinary principles of equity. Although, as we have said, it is questionable whether this issue was raised in the Bliss and Republic cases, the Courts were certainly not impressed that an obvious injustice would arise to defendants in those cases in fixing the royalties due from United as the measure of damage.

In Williams v. Bankhead, 19 Wall. 563, 86 U.S. 563, 571, 22 L.Ed. 184, the Court said:

"The general rule as to parties in chancery is, that all ought to be made parties who are interested in the controversy, in order that there may be an end of litigation. But there are qualifications of this rule arising out of public policy and the necessities of particular cases. The true distinction appears to be as follows: First. Where a person will be directly affected by a decree, he is an indispensable party, unless the parties are too numerous to be brought before the court, when the case is subject to a special rule. Secondly. Where a person is interested in the controversy, but will not be directly affected by a decree made in his absence, he is not an indispensable party, but he should be made a party if possible, and the court will not proceed to a decree without him if he can be reached. Thirdly. Where he is not interested in the controversy between the immediate litigants, but has an interest in the subject-matter which may be conveniently settled in the suit, and thereby prevent further litigation, he may be a party or not, at the option of the complainant."

In Shields v. Barrow, 17 How. 129, 139, 58 U.S. 129, 139, 15 L.Ed. 158, the Court noted, in the following language, three classes of parties to a bill in equity:

"The court here points out three classes of parties to a bill in equity. They are: 1. Formal parties. 2. Persons having an interest in the controversy, and who ought to be made parties, in order that the court may act on that rule which requires it to decide on, and finally determine the entire controversy, and do complete justice, by adjusting all the rights involved in it. These persons are commonly termed necessary parties, but if their interests are separable from those of the parties before the court, so that the court can proceed to a decree, and do complete and final justice, without affecting other persons not before the court, the latter are not indispensable parties. 3. Persons who not only have an interest in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience."

See also Gibson's Suits in Chancery, Fifth Edition, Sec. 99.

Defendant claims that United's interest is such that a final decree cannot be made without affecting United's interest and that the controversy would be left in such condition that a final termination would be inconsistent with equity and good conscience. It should be observed, of course, that the major force of defendant's argument lay in the assertion that United rather than defendant would be hurt. And in his argument before the Court, defendant's counsel was so carried away with the intensity of his advocacy of the injustice to United that several times he referred to United as his client. We think these slips of counsel's tongue highlight the weakness of defendant's position as to the necessity of the presence of United. This cause was instituted in 1945. If United had any real interest in the

case there was ample time for it to have entered an appearance. Defendant would not be hurt, since at the accounting, presumably the plaintiffs would receive only the royalty to which they would be entitled from United. The plaintiffs were not, in the Bliss and Republic cases, adjudged any sums to which United was entitled. Should this Court reach that question, they will not be adjudged any such sums here.

We conclude our consideration of this subject by referring to a statement of the Court in State of Washington v. United States, 87 F.2d 421, 427 (C.C.A. 9):

> "There are many adjudicated cases in which expressions are made with respect to the tests used to determine whether an absent party is a necessary party or an indispensable party. From these authorities it appears that the absent party must be interested in the controversy. After first determining that such party is interested in the controversy, the court must make a determination of the following questions applied to the particular case: (1) Is the interest of the absent party distinct and severable? (2) In the absence of such party, can the court render justice between the parties before it? (3) Will the decree made, in the absence of such party, have no injurious effect on the interest of such absent party? (4) Will the final determination, in the absence of such party, be consistent with equity and good conscience?

> "If, after the court determines that an absent party is interested in the controversy, it finds that all of the four questions outlined above are answered in the affirmative with respect to the absent party's interest, then such absent party is a necessary party. However, if any one of the four questions is answered in the negative, then the absent party is indispensable."

See also Boris v. Moore, 152 F.Supp. 602, 607 (U.S.D.C.Wis.); Gorham v. Edwards, 160 F.Supp. 928, 931, (U.S.D.C. N.Y.).

 In our opinion the interest, if any, of United in an infringement suit is severable from that of Cold Metal and United is not a necessary party to this case. We conclude also in the light of the above discussion that, were there an infringement, the plaintiffs would have an equitable interest here.

Let an order be presented in conformity with the views herein expressed.